# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## SEPTEMBER 2013 TERM

_____

No. 12-1028

_____

FILED

**October 25, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

### DAVID BALLARD, WARDEN,
### MOUNT OLIVE CORRECTIONAL COMPLEX,
Respondent Below, Petitioner

V.

### BRIAN BUSH FERGUSON,
Petitioner Below, Respondent

---

Appeal from the Circuit Court of Monongalia County
Honorable Phillip D. Gaujot, Judge
Civil Action No. 06-C-202

AFFIRMED

---

Submitted: October 16, 2013
Filed: October 25, 2013

Marcia Ashdown
Prosecuting Attorney
Perri DeChristopher
Assistant Prosecutor
Morgantown, West Virginia
Attorneys for Petitioner

Darrell Ringer
The Law Offices of Darrell Ringer
Morgantown, West Virginia
Paul W. Schmidt
Sarah L. Wilson
Christian J. Pistilli
Covington & Burling
Washington, District of Columbia
Attorneys for Respondent

**JUSTICE DAVIS delivered the Opinion of the Court.**

**JUSTICES WORKMAN and LOUGHRY dissent and reserve the right to file dissenting opinions.**

**SYLLABUS BY THE COURT**

1.      A final judgment entered by a circuit court under the provisions of the West Virginia Post–Conviction Habeas Corpus Act may be appealed by either party under W. Va. Code § 53–4A–9(a) (1967) (Repl. Vol. 2008)

2.      "A trial court lacks jurisdiction to enter a valid judgment of conviction against an accused who was denied effective assistance of counsel and a judgment so entered is void." Syllabus point 25, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974).

3.      "In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syllabus point 6, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

4.      "The fulcrum for any ineffective assistance of counsel claim is the adequacy of counsel's investigation. Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, counsel must at a minimum conduct a reasonable investigation enabling him or her to make informed decisions about

i

how best to represent criminal clients. Thus, the presumption is simply inappropriate if counsel's strategic decisions are made after an inadequate investigation." Syllabus point 3, *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 465 S.E.2d 416 (1995).

**Davis, Justice:**

This is an appeal of David Ballard, Warden of Mount Olive Correctional Complex ("the State"), from an order of the Circuit Court of Monongalia County that granted habeas corpus relief to Brian Bush Ferguson ("Mr. Ferguson"). The State contends that (1) the circuit court erred in finding that Mr. Ferguson was denied effective assistance of trial counsel and (2) the circuit court erred in limiting the testimony of one of its expert witnesses during the habeas corpus proceeding.[1] Finding no error in the circuit court's rulings, we affirm.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On February 2, 2002, at around 7:00 p.m., Jerry Wilkins was shot in the back outside his apartment near University Avenue in Morgantown, West Virginia.[2] Mr. Wilkins died in a hospital shortly after the shooting. Within hours of the shooting, the police received varying descriptions of the assailant from several witnesses.[3] The police also learned that

---

[1]The State set out five assignments of error that will be addressed in the framework of the two issues.

[2]Mr. Wilkins was a graduate student at West Virginia University ("WVU").

[3]The witnesses described the assailant as an African-American male, 6' to 6'2" tall, weighing 180 to 200 lbs., and wearing a dark hooded jacket or sweatshirt and black pants.

1

Mr. Ferguson[4] was a person known to have a grudge against the victim.[5] Subsequent to the investigation by the police, Mr. Ferguson was indicted by a grand jury for first degree murder.

A jury trial was held in the case in November of 2002. During the trial, the State called Brian Johnson, a friend of Mr. Ferguson, as a witness. Mr. Johnson testified that, a few weeks before the murder, he saw a large stainless steel revolver in Mr. Ferguson's apartment.[6] Mr. Ferguson called it a magnum.[7] There was also testimony by Mr. Johnson that, after the murder , Mr. Ferguson told him that the weapon was "long gone, that police had no eyewitness to identify the perpetrator and that there was no gunshot residue."[8] Mr. Johnson also testified that Mr. Ferguson was not with him prior to the murder.[9] A friend of the victim, Solomon Wright, testified that the victim stated shortly before his murder that if

---

[4]At that time, Mr. Ferguson was an undergraduate student at WVU.

[5]The grudge was alleged to have centered around the victim's interest in Mr. Ferguson's girlfriend.

[6]A witness to the murder described the assailant's weapon as a long handgun that was silver in color.

[7]The bullet that killed the victim was a .44 caliber magnum bullet. The State also presented evidence that a .44 caliber magnum casing was found in the trash dumpster where Mr. Ferguson placed his garbage.

[8]The State presented evidence at the trial that gunshot residue was found on clothing retrieved from Mr. Ferguson on the night of the murder.

[9]Mr. Ferguson had informed the police that he was with Mr. Johnson at some point before the murder.

anything happened to him, Mr. Ferguson would be responsible. Another witness, Bernard Russ, testified that Mr. Ferguson once stated that "I am going to get Jerry when his fraternity brothers are not around."[10] There also was evidence that suggested Mr. Ferguson was stalking the victim prior to the murder.[11] The State additionally presented evidence that Mr. Ferguson once threatened the victim with a knife.

Mr. Ferguson testified in his own defense and called several witnesses. One of Mr. Ferguson's witnesses, his girlfriend Ebony Gibson, testified that Mr. Ferguson did not pull a knife on the victim.[12] Mr. Ferguson testified that although he did not like the victim, he never threatened the victim with a knife, nor did he ever indirectly threaten the victim. Mr. Ferguson testified that he was alone in his apartment during the afternoon on the day that the victim was killed. Later, he went to a recreation center.[13] Mr. Ferguson denied killing the victim.

---

[10]This statement was made after Mr. Ferguson was thrown out of a party that was given by the victim's fraternity.

[11]This evidence came in the form of testimony that Mr. Ferguson was seen parked in the area where the victim lived.

[12]The State called a rebuttal witness who testified that Ms. Gibson had told her that Mr. Ferguson pulled a knife on the victim.

[13]The State presented evidence that the recreation center's data entry showed that Mr. Ferguson entered the center at 7:39 p.m., and that the center was less than a mile from where the shooting took place.

The jury returned a verdict on November 26, 2002, finding Mr. Ferguson guilty of murder in the first degree, without a recommendation of mercy. The trial court subsequently sentenced Mr. Ferguson to prison for life without the possibility of parole. Mr. Ferguson appealed the verdict to this Court, and we affirmed the judgment in *State v. Ferguson*, 216 W. Va. 420, 607 S.E.2d 526 (2004), *cert. denied*, 546 U.S. 812, 126 S. Ct. 332, 163 L. Ed. 2d 45 (2005).

Mr. Ferguson filed a petition for habeas relief in March of 2006. By order dated September 11, 2007, the circuit court summarily dismissed the petition without holding an omnibus hearing. Mr. Ferguson filed a petition for appeal with this Court. We remanded the case to the circuit court to hold an omnibus hearing. The circuit court held a three-day omnibus hearing in September 2011. During the hearing, Mr. Ferguson called two witnesses who testified that, shortly after the victim was killed, a person named Robert Coles told them that he had killed the victim. One of the two witnesses, Mary J. Linville, testified that she gave a statement to the police informing them of Mr. Coles' confession prior to the trial. There was evidence that Mr. Ferguson's trial counsel learned of Ms. Linville's statement implicating Mr. Coles through material obtained from the State during discovery. There was also evidence that trial counsel failed to do an independent investigation of Ms. Linville's statement. By order entered August 8, 2012, the circuit court found that Mr. Ferguson was denied effective assistance of counsel because trial counsel failed to investigate the confession by Mr. Coles. The order required the State to release Mr. Ferguson if it did not

4

retry him or file an appeal.  This State filed this appeal.

## II.

## STANDARD OF REVIEW

In this appeal, we are called upon to review the trial court's order in a habeas

corpus proceeding. We have held the following regarding the standard of review of such an

order:

> In reviewing challenges to the findings and conclusions
> of the circuit court in a habeas corpus action, we apply a
> three-prong standard of review. We review the final order and
> the ultimate disposition under an abuse of discretion standard;
> the underlying factual findings under a clearly erroneous
> standard; and questions of law are subject to a *de novo* review.

Syl. pt. 1, *Mathena v. Haines*, 219 W. Va. 417, 633 S.E.2d 771 (2006).  *See also* Syl. pt. 1,

*State ex rel. Postelwaite v. Bechtold*, 158 W. Va. 479, 212 S.E.2d 69 (1975) ("Findings of

fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside

or reversed on appeal by this Court unless such findings are clearly wrong.").

## III.

## DISCUSSION

In this proceeding, the State has filed an appeal from the circuit court's

decision granting habeas relief to Mr. Ferguson. Our cases have recognized, and we so hold,

that "[a] final judgment entered by a circuit court under the provisions of the West Virginia

5

Post–Conviction Habeas Corpus Act may be appealed . . . by either party [under W. Va. Code § 53–4A–9(a) (1967) (Repl. Vol. 2008)]." *Coleman v. Brown*, 229 W. Va. 227, 231 n.6, 728 S.E.2d 111, 115 n.6 (2012). *See also State v. Green*, 207 W. Va. 530, 534 n.5, 534 S.E.2d 395, 399 n.5 (2000) ("The State's right to appeal an adverse ruling in habeas corpus is expressly provided by statute.").

The State argues that the circuit court committed error in granting Mr. Ferguson habeas relief. According to the State, trial counsel made a reasonable strategic decision to not conduct an independent investigation of Ms. Linville's statement implicating Mr. Coles. The circuit court determined that the decision to not investigate Ms. Linville's statement was not reasonable. The circuit court further reasoned that such failure to investigate probably affected the outcome of the case.

Our law is clear in recognizing that the Sixth Amendment of the federal constitution and Article III, § 14 of the state constitution guarantee not only the assistance of counsel in a criminal proceeding but that a defendant has "the right to effective assistance of counsel." *Cole v. White*, 180 W. Va. 393, 395, 376 S.E.2d 599, 601 (1988). We have held that "[a] trial court lacks jurisdiction to enter a valid judgment of conviction against an accused who was denied effective assistance of counsel and a judgment so entered is void." Syl. pt. 25, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974). We have adopted a two-pronged test to determine whether a defendant has received effective assistance of

6

counsel:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. pt. 6, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). *See also* Syl. pt. 21, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974) ("Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.").

We will examine the issue of ineffective assistance of counsel in two parts: (1) determining whether counsel's performance was deficient and (2) considering whether the result of the trial may result have been different.

### A. *Determining Whether Counsel's Performance Was Deficient.*

During the habeas proceeding, Mr. Ferguson's Trial Counsel, James

Zimarowski, testified.[14]  Mr. Zimarowski testified that, during discovery in the underlying case, he received a police report concerning a possible suspect in the murder of Mr. Wilkins. The police report indicated that roughly nine weeks after the murder, Mary J. Linville was arrested in a federal drug sweep.  After her arrest, Ms. Linville gave the following statement, as recorded by a police officer, regarding Mr. Wilkins' murder:

> Mary Linville advised that two days after the shooting of Jerry Wilkins, she was at [Ms.] Spring King's trailer in trailer park off Burroughs Street.  Mary Linville said that it was around 0300-0400 hours.  Mary Linville said that Robbie Coles showed up at the trailer with a heavy set girl. Mary Linville said that Robbie Coles was drunk and said, "Know that Jerry kid in the paper that got shot, I shot him." Mary Linville said that Robbie Coles said that the police did not [know] what they were talking about, that he shot him in the chest and not the back.  Mary Linville said that Robbie Coles advised that he shot Jerry Wilkins because he did not like the way he looked at him.  Mary Linville said that Spring King had since moved [to] the Waynesburg area.

In addition to obtaining the above report, Mr. Zimarowski also received information that Mr. Coles denied making the confession and that he passed a polygraph test that showed he had no involvement with the death of Mr. Wilkins.

Mr. Zimarowski testified that he did not attempt to contact Ms. Linville, Ms. King, Mr. Coles, nor the "heavy set girl."  It was Mr. Zimarowski's belief that Ms. Linville's

---

[14]Mr. Zimarowski testified that he had practiced law for approximately thirty years and that he had defended approximately twenty-one first degree murder cases.  Some of those representations resulted in acquittals.

statement lacked credibility and that it would hurt Mr. Ferguson's defense if he tried to use testimony from a person arrested for drug offenses. Mr. Zimarowski also believed that Mr. Coles would cause a mistrial by blurting out that he passed a polygraph test.[15] Mr. Zimarowski also testified that he believed Mr. Ferguson's case would be harmed because the jury would believe he created a false suspect.

During the habeas proceeding, the State also called an expert witness, J. Michael Benninger, who opined that Mr. Zimarowski did not provide ineffective assistance of counsel by failing to investigate Ms. Linville's statement.[16] Mr. Ferguson called an expert witness, Stephen Jory, who opined that Mr. Zimarowski's failure to investigate Ms. Linville's statement was constitutionally deficient. The trial court adopted the opinion of Mr. Ferguson's expert on the deficiency prong of our test.

In conducting our review, we must make clear that, in addressing the issue of whether a reasonable attorney would have investigated Ms. Linville's statement, we are not concerned with the statement's truth or falsity, or whether the statement itself might have led

---

[15]"Polygraph test results are not admissible in evidence in a criminal trial in this State." Syl. pt. 2, *State v. Frazier*, 162 W. Va. 602, 252 S.E.2d 39 (1979).

[16]The State also called Raymond H. Yackel as an expert. However, the circuit court limited his testimony to issues involving the polygraph test.

to adverse consequences for Mr. Ferguson at trial. The sole issue presented now is whether Mr. Zimarowski acted as a reasonable criminal defense attorney in failing to attempt to interview Ms. Linville, Ms. King, Mr. Coles, and the "heavy set girl." We believe that such failure was not objectively reasonable.

This Court has previously noted that, "under the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his or her choices." *State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 465 S.E.2d 416 (1995). With respect to evaluating an attorney's failure to investigate an issue, we held in *Daniel*:

> The fulcrum for any ineffective assistance of counsel claim is the adequacy of counsel's investigation. Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, counsel must at a minimum conduct a reasonable investigation enabling him or her to make informed decisions about how best to represent criminal clients. Thus, the presumption is simply inappropriate if counsel's strategic decisions are made after an inadequate investigation.

Syl. pt. 3, *Danie, id*.

In the instant proceeding,, Mr. Zimarowski did not make any investigation into whether or not Mr. Coles had a role in causing the death of Mr. Wilkins. Instead, Mr. Zimarowski chose to rely upon information in the police report which suggested that Ms.

10

Linville's statement was false because Mr. Coles passed a polygraph test.[17] The circuit court's order noted that courts have found ineffective assistance of counsel in cases where trial "counsel blindly relies upon, and fails to investigate beyond, material information contained within a police report." For example, the appellate court in *Origer v. Iowa*, 495 N.W.2d 132 (Iowa Ct. App. 1992), squarely addressed the issue of trial counsel relying on a police report and failing to do an independent investigation of allegations in the report. The defendant in *Origer* was convicted of two murders. One conviction was reversed on direct appeal on the grounds of insufficiency of evidence, but the second conviction was affirmed. The defendant eventually challenged the second conviction in a habeas proceeding. One of the issues the defendant raised in the habeas proceeding was that his trial counsel was ineffective in failing to investigate a police report of a woman who alleged someone else confessed to the crime. The habeas court granted relief. The State appealed. The appellate court affirmed as follows:

> In April 1985, Lori Engleson was interviewed by the [police]. She reported that she overheard Mary Jo Payne say she knew who killed the people in Forest City. . . .
>
> . . . . .
>
> The defense counsel for Origer relied extensively on the investigations conducted by the [police]. Although the Lori Engleson statement was available to defense counsel before trial, defense counsel never conducted any independent

---

[17]Mr. Ferguson had an independent polygraph examiner, Barry Colvert, review the raw data from Mr. Coles' polygraph test. Mr. Colvert testified during the habeas proceeding that he would not have rated Mr. Coles as having passed the polygraph test.

investigations into the substance and validity of her allegations.

Again, defense counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. We agree with the findings of the district court that, had defense counsel followed up on the Engleson statement, defense counsel would have obtained the information set forth in the testimony of Mary Jo and Billy Payne.[18] Such testimony would have been consistent with Origer's alibi defense and alibi testimony. We find the failure to investigate in this regard creates a reasonable probability that, if there had been a more thorough investigation of the statements made by these persons in Iowa Falls, the result of the proceeding would have been different.

Origer, 495 N.W.2d at 137-138 (internal citations omitted).

---

[18]The opinion described Mary Jo and Billy Payne's testimony as follows:

At the postconviction hearing, Mary Jo Payne testified that following Origer's arrest she saw Mike Mallory and Keven Schwebke playing pool at a bar located near Iowa Falls. She heard Schwebke accuse Mallory of the murders. According to Mary Jo Payne, Schwebke said: "He thought it was pretty funny to have a white boy take the rap for what he did and get away with it scot free." When Mary Jo Payne asked Mallory whether the allegations were true, Mallory only said "What's it to you?"

Billy Payne, Mary Jo Payne's brother, also testified at the postconviction hearing. He testified that, on February 9, 1985, Mallory, looking anxious and nervous, told him he was going to Forest City "to take care of business." Billy Payne also testified Mallory had told him several days later he had "wasted these people up in Forest City," but he believed Mallory was only bragging.

Origer, 495 N.W.2d at 137.

In *Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011) the Fourth Circuit addressed the issue of trial counsel limiting an investigation to police reports. The defendant in *Elmore* was convicted of murder and other crimes and was sentenced to death.[19] In the habeas proceeding before the Fourth Circuit the defendant argued that he received ineffective assistance of counsel because his trial lawyers failed to perform an independent investigation of forensic evidence collected by the police. The Fourth Circuit agreed with the defendant as follows:

> [W]e conclude that Elmore is entitled to habeas corpus relief. . . . Simply put, the gross failure of Elmore's 1984 trial lawyers to investigate the State's forensic evidence—including the medical examiner's time-of-death opinion, the pubic hairs allegedly recovered from Mrs. Edwards's bed, the nature of the "Item T" materials removed from Mrs. Edwards's bloody abdomen, and the fingerprint lifted from the blood-smeared toilet in Mrs. Edwards's en suite bathroom—had a palpably adverse effect on the defense.
>
> . . . .
>
> The defense team . . . admitted to being lulled into inaction by the belief that the police were above reproach. At most, the defense team gave fleeting thought to hiring experts to examine the evidence. Anderson blamed scarce state resources, but his testimony indicated that he and Beasley never isolated evidence deserving further examination, identified appropriate experts and ascertained their fees, or inquired about state and other possible sources of funding.
>
> . . . .

---

[19]The case was tried several times. The defendant's last death sentence was vacated, and he was sentenced to life imprisonment because he was determined to be mentally retarded.

13

Of course, it is now clear . . . that an investigation into the State's evidence would have exposed a multitude of questions about its legitimacy and reliability. . . .

. . . .

To be sure, it was thus an unreasonable application of [law] to rule that the failure of Elmore's lawyers to investigate the State's forensic evidence was justified by their faith in the integrity and infallibility of the police. . . .

*Elmore*, 661 F.3d at 851-59 (footnote omitted).

In *Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir. 1987), the Seventh Circuit was called upon to address trial counsel's failure to investigate five possible occurrence witnesses listed in a police report. The defendant in *Sullivan* was convicted of murder at a bench trial by the State of Illinois and was sentenced to twenty-nine years imprisonment. After exhausting his state court remedies, the defendant filed a federal habeas petition. A federal district court granted habeas relief to the defendant, and the State appealed. The Seventh Circuit affirmed habeas relief as follows:

It is undisputed that, prior to trial, defense counsel was aware, through the police reports and discovery, that there were five witnesses, with no apparent reason to help the defendant, who made statements to the police that were exculpatory or inconsistent with the prosecution witnesses' statements. The names and addresses of these witnesses were available to defense counsel; yet his attempts to locate and to interview them were perfunctory at best. Given the importance of these witnesses to the defendant's case . . . it was not reasonable for trial defense counsel to rely on his own letter and telephone attempts or the attempts of the defendant's aunt to contact the witnesses.

14

Again, we stress that we do not hold that trial defense counsel must track down every lead or must personally investigate every evidentiary possibility before choosing a defense and developing it. We simply hold that, under the circumstances presented here, it was not reasonable for defense counsel to permit his client to stand trial for murder without a more thorough investigation of the available evidence.

*Sullivan*, 819 F.2d at 1391-92. *See also Crisp v. Duckworth*, 743 F.2d 580, 584 (7th Cir. 1984) ("We do not agree that police statements can generally serve as an adequate substitute for a personal interview."); *Hoots v. Allsbrook*, 785 F.2d 1214, 1219-1220 (4th Cir. 1986) ("Giving Weldon's decision not to carry his investigation of possible eyewitness testimony past a review of the police report the proper amount of deference, however, we would be inclined to find that his performance in this respect was sufficiently deficient to satisfy the first prong part of the *Strickland* test. Neglect even to interview available eyewitnesses to a crime simply cannot be ascribed to trial strategy and tactics. Here, Weldon's conceded basis for foregoing any interview with three of the four witnesses to the robbery was simply that solely on his reading of a police report he concluded that interviews were not warranted."); *Garza v. Wolff*, 528 F.2d 208, 213 (8th Cir. 1975) ("We conclude that counsel was delinquent in not calling as witnesses each of the persons that accompanied [the victim] in the car at the time of the alleged rape as well as his failure to investigate the police report published in the Omaha World Herald.").

In *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) the United States Supreme Court addressed the issue of trial counsel relying solely upon

15

information supplied in government reports. The defendant in *Wiggins* was convicted of murder and sentenced to death. One of the issues raised in his habeas appeal was that his trial attorneys were ineffective during the sentencing phase because they failed to independently investigate and present mitigating evidence of his dysfunctional background.[20] The Supreme Court agreed:

> [C]ounsel had available to them the written PSI [presentence investigation], which included a one-page account of Wiggins' personal history" noting his "misery as a youth," quoting his description of his own background as " 'disgusting,'" and observing that he spent most of his life in foster care. Counsel also "tracked down" records kept by the Baltimore City Department of Social Services (DSS) documenting petitioner's various placements in the State's foster care system. . . .
>
> Counsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards. . . .
>
> The scope of their investigation was also unreasonable in light of what counsel actually discovered in the DSS records. The records revealed several facts: Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food. As the Federal District Court emphasized, any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background.

*Wiggins*, 539 U.S. at 523-25, 123 S. Ct. at 2536-537. *See also Rompilla v. Beard*, 545 U.S.

---

[20]The defendant's trial was bifurcated. The defendant elected to have a bench trial for the guilt phase and a jury trial for the sentencing phase.

374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (granting habeas relief in death penalty case where trial counsel failed to provide an adequate investigation).

In the instant proceeding, the circuit court found that the evidence established that Mr. Zimarowski's failure to conduct an independent investigation of Ms. Linville's statement was deficient under an objective standard of reasonableness. The circuit court's order addressed the matter in part as follows:

> In advance of trial, Mr. Zimarowski received and reviewed a complete police report, which memorialized all investigatory steps taken by the Morgantown Police Department in relation to the subject shooting. The report included Detective Ford's version of the Linville drug debriefing, at which Ms. Linville discussed the purported confession of Robbie Coles and the existence of two other individuals who witnessed the event. The report indicated that Mr. Coles denied making a confession, and that Mr. Coles passed a polygraph test.

> Having received and reviewed the police report, Mr. Zimarowski knew, or should have known, that the police failed to make contact with Spring King, with the unidentified woman who purportedly accompanied Mr. Coles to Spring King's trailer, or with anyone else possessing potentially relevant information. Nevertheless, Mr. Zimarowski declined to independently investigate the purported confession. He made no effort to contact Mr. Coles, Ms. Linville, Ms. King, or anyone connected to these individuals. He made no effort to identify and establish contact with the unidentified woman who purportedly accompanied Mr. Coles. He made no effort to determine Mr. Coles's whereabouts on February 2, 2002, Mr. Coles's physical characteristics, Mr. Coles's criminal history, or Mr. Coles's access to firearms. In fact, Mr. Zimarowski failed to explore any of the questions left unanswered by the police report, including whether the report itself was complete and accurate. Such conduct clearly contravened the norms of criminal defense

17

practice in effect at the time, especially in a case which exposed Mr. Ferguson to the most severe criminal penalty under West Virginia law.

. . . .

At trial, Mr. Zimarowski attempted to advance his theory of the case –that someone other than Mr. Ferguson shot Jerry Wilkins --by employing a multi-layered strategy. In addition to "throwing Coles out there" for the jury to consider, Mr. Zimarowski attempted to convince the jury that the police not only rushed to judgment, but that the police conducted a sloppy, incomplete investigation. Had he himself adequately investigated the Coles confession, Mr. Zimarowski would have, and should have, uncovered evidence highly supportive of these trial themes. For example, when Detective Ford testified on redirect examination at trial that the police had followed up on the Coles confession, Mr. Zimarowski could have introduced evidence strongly rebutting the detective's assertion. This is not to mention the evidence that could have been introduced to support third-party guilt, which, as we know, was the central, overarching theory of the defense.

. . . .

Because trial counsel limited his investigation of the Coles confession to a police report that contained obvious, potentially fruitful leads, because trial counsel provides insufficient justification for his cursory investigation of the Coles confession, and because trial counsel acted in contravention of the prevailing norms of practice at the time of the subject investigation and trial, the Court finds trial counsel's performance deficient under an objective standard of reasonableness.

In this appeal, the State has failed to demonstrate any error in the circuit court's determination that Mr. Zimarowski's performance was constitutionally deficient. The State

18

contends that the circuit court's ruling has "set the bar too low" because it did not accord deference to Mr. Zimarowski's testimony explaining his strategy. We reject this argument because there was no objectively reasonable strategic justification for Mr. Zimarowski's failure to investigate Ms. Linville's statement. Mr. Zimarowski "failed to conduct even the minimal investigation that would have enabled him to come to an informed decision about what defense to offer. . . . Describing [Mr. Zimarowski's] conduct as 'strategic' strips that term of all substance." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

Mr. Zimarowski also testified during the habeas proceeding that he believed Ms. Linville's arrest for drug trafficking would cause the jury to not believe the testimony regarding Mr. Coles. This contention has no merit and does not justify Mr. Zimarowski's failure to investigate Ms. Linville's statement. Moreover, given the circumstances in which Ms. Linville made the statement implicating Mr. Coles, we do not believe that a jury would totally discredit Ms. Linville merely because she had a criminal history. The record in this proceeding demonstrated that Ms. Linville revealed Mr. Coles' confession for the purpose of getting leniency in the criminal case against her. A jury could infer that Ms. Linville was being truthful about the statement because she believed it would help her–not harm her. In fact, the greatest credibility asset Ms. Linville possessed was the fact that she had no apparent relationship with or knowledge of Mr. Ferguson. In other words, she did not

19

provide the statement to help someone she knew.[21]  Finally, assuming, for the sake of

argument, that Ms. Linville was an undesirable witness, there was no evidence showing that

Ms. King or the "heavy set" woman had criminal records[22] or would be undesirable

witnesses.[23]  Therefore, any potential problems in calling Ms. Linville as a witness did not

relieve Mr. Zimarowski of his duty to conduct an independent investigation of her statement.

Mr. Zimarowski attempted to show the harmlessness of his conduct during the

habeas proceeding by testifying that he informed Mr. Ferguson and his family that the police

had a report that implicated Mr. Coles.  We find no merit to this argument.  We will assume

that Mr. Ferguson acquiesced in Mr. Zimarowski's strategy for dealing with the police report.

It was impossible for Mr. Ferguson to appreciate the compelling nature of the police report

without a thorough investigation into the matter.  To the extent that Mr. Ferguson thought

the report was more harmful than helpful, it was because of the erroneous way Mr.

Zimarowski portrayed the report to him. It has been observed that a  defendant "requires the

guiding hand of counsel at every step in the proceedings against him.  Without it, though he

be not guilty, he faces the danger of conviction because he does not know how to establish

---

[21]There is nothing in the record to show that Mr. Ferguson and Ms. Linville knew each other.

[22]During the habeas proceeding, it became apparent that Ms. King was using drugs during the period of time that the murder occurred.

[23]It should also be noted that if Mr. Zimarowski had conducted a timely investigation into Ms. Linville's statement, he may have learned the identity of other people that knew of Mr. Coles' confession or alleged involvement with the murder of Mr. Wilkins.

20

his innocence." *Powell v. Alabama*, 287 U.S. 45, 68–69, 53 S. Ct. 55, 64, 77 L.Ed. 158 (1932). Mr. Ferguson retained Mr. Zimarowski because, despite his protestations of innocence, he did not know how to navigate the legal process to establish his innocence. Insofar as Mr. Ferguson relied upon Mr. Zimarowski to establish his innocence, Mr. Zimarowski cannot blame Mr. Ferguson for trusting his judgment and strategy.

In sum, we believe the evidence overwhelmingly supported the habeas trial court's determination that Mr. Zimarowski's performance was constitutionally deficient.[24]

### B. Determining Whether the Result May Have Been Different.

Although we have determined that the circuit court was correct in finding Mr. Zimarowski's performance was deficient under an objective standard of reasonableness, Mr. Ferguson is not entitled to relief unless we also conclude that he was prejudiced by the deficient performance. *See State ex rel. Daniel v. Legursky*, 195 W. Va. 314, 325, 465 S.E.2d 416, 427 (1995) ("A finding of unprofessional conduct, however, does not end our inquiry. In order to obtain relief . . . [the defendant] must demonstrate that the complained of deficiency resulted in prejudice[.]"). That is, under the prejudice prong, Mr. Ferguson "must show that there is a reasonable probability that, but for counsel's unprofessional errors,

---

[24]We wish to point out that the Court is aware that Mr. Zimarowski is an excellent criminal defense attorney and has a reputation of being one of the state's leading criminal attorneys. Unfortunately in this case Mr. Zimarowski 's conduct missed the mark.

the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674 (1984).

During the habeas proceeding, Mr. Ferguson called Ms. Linville and Ms. King. Both women testified that, on the night that Mr. Wilkins was killed, Mr. Coles confessed to shooting a man that was later determined to be Mr. Wilkins. Ms. Linville testified to the matter as follows:

> Q. So tell us what happened that night when Robbie Coles came to visit Spring King's trailer.
>
> A. Well, we were sitting there in her trailer, and like the living room was at the end of the trailer. And the drive was here. And we heard a car outside, and we were like – and then two doors, and then it was just knocking on the door. And she got up to say, who is it, because she wasn't expecting anybody. And it was Robbie, and he said, let me in, I need to talk and I need to come in for a second.
>
> Q. How was Robbie behaving?
>
> A. He was real anxious and very nervous and just fidgety, you know, like taking two or three steps this way and that way and talking pretty fast and kept fiddling with his hoodie he had on, his pockets.
>
> . . . .
>
> Q. Was Robbie alone?
>
> A. No. He had a female with him.
>
> Q. Did you know who the female was?

A. No.

. . . .

Q. What did Robbie tell you? What did Robbie say when he came into Spring King's trailer that night?

A. Well, he said he needed a place to hide out. And I'll just kind of quote what he said.

Q. Yeah. Do you remember the terms that he used?

A. To the best of my knowledge, he was like, "Man, you-all got to give me a place to hide out. I just shot a fucking nigger up on the hill, come down from the school, and I know he's dead because I shot like three times and I hit him." And he put his hand here, and said that after he knowed that the third bullet hit him, he said he just dropped.

Q. He put his hand on his shoulder?

A. Well, his back area, close to his neck there, up by his shoulder blade – between his shoulder blade and his, you know, neck, spine.

Ms. King gave the following version of what happened when Mr. Coles came to her home on the evening of Mr. Wilkins' murder:

Q. Tell us about the times that you seen Robbie Coles.

A. I've seen him twice. Once prior, he had spit in my face and we had a confrontation. And then the second time, he had come to my home.

Q. And he came to your home on Burroughs Road?

A. Yes. Beating on my door one evening really loud.

23

Q. Tell us about how Robbie Coles was acting that night that he came to your door.

A. Very obnoxious, pacing back and forth, very – very nervous, very – like he scared me.

Q. Was there anyone else with him?

A. There was a girl with him.

Q. Did you know who the girl was?

A. No.

. . . .

Q. Was there anyone else with you at your home when Robbie Coles came to visit?

A. Yes, there was.

Q. And who was that?

A. That would have been my neighbor, Janie Linville.

. . . .

Q. Do you recall what – how Robbie Coles was dressed?

A. He had a dark hoodie on, dark jeans and a pair of boots. He had dark clothes on.

Q. And how was he acting?
A. He was acting very – like pacing back and forth. I had asked him to leave several times and he just was pacing back and forth and acting really strange.

Q. And what comments did he make? What did he say to you?

A. He said I can't believe I just did what I did. I just shot a man down the hill. I said – and I asked him to leave my

24

residence at that time.

. . . .

Q. And did he leave?

A. Briefly, he didn't leave. Janie had left me there with him and her. And I thought maybe she was going to call the police at the time but apparently she didn't. And about four to five minutes later, they had left and Janie came back to check on me to make sure everything was okay.

In view of the testimony of Ms. Linville and Ms. King, the circuit court concluded that "had trial counsel presented evidence derived from a proper investigation of the Coles confession, there is a reasonable probability that the result of Mr. Ferguson's trial would have been different." We agree.

Although the State presented sufficient evidence for the jury to convict Mr. Ferguson, that evidence was circumstantial evidence. There was no eyewitness identification of Mr. Ferguson. Even though Mr. Wilkins appears to have gone into shock very soon after he was shot, he was able to communicate briefly with people around him. The record indicates that Mr. Wilkins stated twice that he had been "shot," and stated that he "didn't want to die." During the brief moments that Mr. Wilkins spoke, he did not identify Mr. Ferguson, whom he knew, or anyone else as the shooter. There was also no evidence directly

linking Mr. Ferguson to the weapon used in the killing.[25]

In our review of the trial record and the habeas corpus testimony of Ms. Linville and Ms. King, we believe that a jury could have reasonable doubts about the guilt of Mr. Ferguson.  The State argues that differences existed in Ms. Linville's habeas testimony, the statement she gave the police, an affidavit given before her testimony, as well as differences with Ms. King's testimony.  The State also argues that Ms. King's habeas testimony differed from a handwritten statement she gave and a typed affidavit that she signed.  The inconsistencies noted by the State are jury credibility issues that do not undermine the most compelling consistency in the testimony of the two witnesses: Mr. Coles stated that he killed the person later identified as Mr. Wilkins.

The United States Supreme Court has stated that "[t]he benchmark for judging any claim of ineffective[] [assistance of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Lafler v. Cooper*, ___ U.S. ___. 132 S. Ct. 1376, 1388, 182 L. Ed. 2d 398 (2012) (internal quotations and citation omitted).  The compelling testimony of Ms. Linville and Ms. King which was unjustifiably kept from the jury because of Mr. Zimarowski's ineffectiveness, conclusively demonstrates that the adversarial process

---

[25]The weapon was never discovered.

in this case was undermined. The best evidence Mr. Ferguson had to defend his claim of innocence at trial was suppressed through Mr. Zimarowski's constitutionally deficient performance.[26]

## IV.

## CONCLUSION

The circuit court's order granting Mr. Ferguson habeas corpus relief in the form of a new trial is affirmed.

Affirmed.

---

[26]We summarily reject the State's assignment of error regarding Mr. Yackel. As we noted earlier in this opinion, the State also called Mr. Yackel as an expert. However, the circuit court limited his testimony to issues involving Mr. Coles' polygraph test. In this appeal, the State assigned error to the circuit court's limitation of Mr. Yackel's testimony. The State contends that Mr. Yackel also should have been allowed to render an opinion that Mr. Zimarowski did not provide ineffective assistance of counsel. The circuit court found that such testimony was repetitive of the testimony of Mr. Benninger. We do not find that the circuit court abused its discretion in limiting Mr. Yackel's testimony. *See* Syl. pt. 1, *State v. Kaufman*, 227 W. Va. 537, 711 S.E.2d 607 (2011) ("Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." (internal quotations and citations omitted)).