# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**David Ballard, Warden,**
**Respondent Below, Petitioner**

**vs)  No. 13-0283** (Pocahontas County 09-C-07)

**David Lee Hurt,**
**Petitioner Below, Respondent**

**FILED**

May 30, 2014

**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

## MEMORANDUM DECISION

Petitioner David Ballard, Warden, by counsel Laura Young and Marland Turner, appeals an order of the Circuit Court of Pocahontas County entered February 21, 2013, which granted Respondent David Lee Hurt's petition for writ of habeas corpus. Respondent, by counsel Crystal Walden, filed a response to which petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Respondent was tried and convicted by a jury of first-degree murder on May 29, 1998, in connection with the robbery and shooting death of Freddie Lester at the gas station and convenience store where he worked in Bluefield, Mercer County, West Virginia.[1] The evidence upon which respondent was convicted is set forth in great detail in the circuit court's order granting respondent's request for habeas relief. Respondent was sentenced to life in prison with a recommendation of mercy. Respondent's post-trial motions for arrest of judgment and a new trial were denied, and his direct appeal was refused by this Court by order entered June 3, 1999.

Respondent filed a *pro se* habeas petition on September 14, 1999, which was denied on November 18, 1999. An amended habeas petition was subsequently filed (by newly appointed counsel) based upon the fact that respondent's co-defendant recanted his trial testimony implicating respondent in the crime. The amended habeas petition was denied by the circuit court.

---

[1]At the end of respondent's first trial, which was held in Mercer County (where Mr. Lester's death occurred), the jury voted ten to two to acquit. As a result of the hung jury, the trial court declared a mistrial. Respondent's trial counsel subsequently moved for and was granted a change of venue due to the publicity attendant to the first trial. Venue was transferred to Pocahontas County.

1

A second habeas petition was filed in November of 2008 alleging that newly discovered evidence supported respondent's innocence[2] and further alleging ineffective assistance of previous habeas counsel. By order entered June 10, 2010, the habeas court applied the two-pronged test set forth in *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995),[3] and concluded that respondent's previous habeas counsel was ineffective. Accordingly, the habeas court ordered that respondent be afforded a new opportunity to present a habeas petition and that grounds raised in the prior habeas matter would not be barred by *res judicata*. An omnibus evidentiary hearing was held on April 15, 2011. By order entered April 18, 2011, the habeas court granted petitioner's request for habeas relief and vacated his conviction.

The State of West Virginia appealed the April 18, 2011, order granting habeas relief. This Court reversed and remanded, concluding, in relevant part, that the habeas court committed error in failing to make specific findings of fact and conclusions of law relating to its finding of ineffective assistance of counsel. *Ballard v. Hurt*, 230 W.Va. 374, 380, 738 S.E.2d 538, 545 (2012). After remand, the habeas court entered a thirty-two page order on February 21, 2013, with extensive findings and conclusions in support of its ruling granting habeas relief. This appeal followed.

This Court reviews appeals of circuit court orders granting habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and

---

[2]The newly discovered evidence of respondent's innocence consisted of statements by Barney and Marsha Wheeler, the parents of respondent's girlfriend, Ginger Wheeler. According to Mr. and Mrs. Wheeler, who had never before been interviewed in connection with the case, respondent was on the telephone with their daughter for a four-hour period spanning the night/morning of Mr. Lester's murder, including the time the crime transpired. Respondent argued that the Wheelers' version of events corroborated his co-defendant's recantation of his prior claim that respondent was involved in Mr. Lester's murder.

[3]In syllabus point 5 of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), this Court held as follows:

> In West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

*See* Syl. Pt. 3, *Ballard v. Ferguson*, 232 W.Va. 196, 751 S.E.2d 716 (2013).

questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009). *See also Ballard v. Ferguson*, 232 W.Va. 196, __, 751 S.E.2d 716, 719 (2013) ("Findings of fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside or reversed on appeal by this Court unless such findings are clearly wrong." (quoting Syl. Pt. 1, *State ex rel. Postelwaite v. Bechtold*, 158 W.Va. 479, 212 S.E.2d 69 (1975)).

On appeal, petitioner argues that the habeas court erred in finding that trial counsel was ineffective for failing to investigate respondent's alibi; failing to secure the attendance of a witness; failing to object to "non-disclosed" State witnesses; seeking a change in venue and then failing to object to the new venue; conducting a "haphazard" *voir dire*; and failing to object to the prosecutor's remarks in closing.

Having carefully reviewed the habeas court's order, this Court concludes that the habeas court did not abuse its discretion in granting respondent's request for habeas corpus relief. The habeas court carefully addressed respondent's claims that his trial counsel was ineffective. More specifically, the habeas court's very detailed order supports its conclusion that trial counsel was ineffective for failing to investigate respondent's alibi that he was not present at the crime scene when Mr. Lester was shot by respondent's co-defendant but, rather, was at home talking with his girlfriend on the telephone. The habeas court made specific reference to the fact that trial counsel failed to interview the girlfriend's parents even though respondent requested that he do so, and further failed to subpoena telephone records in an effort to corroborate respondent's alibi in this regard. The habeas court observed that respondent's alibi should have been investigated and efforts to corroborate it should have been made, especially given the fact that respondent's co-defendant recanted his initial testimony implicating respondent and then later changed course again, claiming that respondent was, in fact, present during the murder of Mr. Lester. This Court cannot conclude that the habeas court abused its discretion in concluding that trial counsel was ineffective under the two-pronged test in *Miller*.

Likewise, the habeas court did not abuse its discretion in concluding that trial counsel was ineffective for failing to subpoena all witnesses necessary for an adequate defense. In particular, the habeas court found that trial counsel failed to secure the attendance of a key witness.[4] Although the witness previously testified in respondent's first trial, the trial court refused to permit his testimony to be read during the retrial. In its February 21, 2013, order, the habeas court explained, in detail, that trial counsel's failure to secure a necessary witness was deficient under the two pronged test set forth in *Miller*. The habeas court did not abuse its discretion in finding that trial counsel was ineffective in this regard.

---

[4]Trial counsel failed to review the return of service and, therefore, was unaware that the witness was not properly served with a subpoena because the witness had moved out of state and no longer lived at the home where service was attempted.

Finally, the habeas court determined that trial counsel was ineffective for failing to object to testimony from two witnesses for the State who were not timely disclosed; requesting a change of venue even though respondent was nearly acquitted in his first trial in Mercer County; failing to object to Pocahontas County as the new venue given that that county is "virtually devoid of African American citizens[;]"[5] failing to inquire, during *voir dire*, if any member of the all-white jury panel was affiliated with The National Alliance, a locally-based white supremacist organization, or any other similar group; and failing to object to closing remarks by the State that characterized respondent as a "drug dealer," a misleading and prejudicial statement that was based on evidence expressly *excluded* by the trial court. The habeas court's in-depth discussion and legal analysis supporting its conclusion that, under *Miller*, trial counsel was deficient in all of these respects was not an abuse of discretion and will not be disturbed on appeal.

Given that the habeas court's order includes extensive and well-reasoned findings and conclusions as to all of the assignments of error raised herein and our conclusion that the habeas court's order and the record before us reflect no clear error or abuse of discretion, we hereby adopt and incorporate the habeas court's findings and conclusions and direct the Clerk to attach a copy of the habeas court's February 21, 2013, order granting respondent's petition for writ of habeas corpus to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** May 30, 2014

**CONCURRED IN BY:**

Chief Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

---

[5]Respondent is African American.

4

IN THE CIRCUIT COURT OF POCAHONTAS COUNTY, WEST VIRGINIA

State ex rel. DAVIE LEE HURT,
    Petitioner,

v.

DAVID BALLARD, WARDEN
MOUNT OLIVE CORRECTIONAL CENTER
    Respondent.

Case No. 09-C-07(P)
Hon. Joseph Pomponio

RECEIVED

MAR 0 7 2013

ATTORNEY GENERAL'S OFFICE

## ORDER

On August 21, 1995, between 3:15 a.m. and 3:35 a.m., a Rich Oil station attendant named Freddie Lester was robbed and murdered, via a .22 caliber bullet fired at close range into the back of his head at the Bluefield Avenue station where he worked.

In the course of the Bluefield Police Department's investigation, it was learned that a juvenile named Michael Hopkins had been seen near the Rich Oil station on the night of the crime. Mr. Hopkins, questioned by police, initially indicated that he knew who had committed the crime, and he implicated three other individuals, including Mr. Hurt. On the basis of Mr. Hopkins' statement, Mr. Hurt, who is African American, and the two others—but not Mr. Hopkins—were charged.

Subsequently, Mr. Hopkins confessed that *he* had shot and killed Freddie Lester and now claimed that Mr. Hurt was a participant but the other two juveniles he had falsely pointed the finger at were not. Mr. Hopkins was charged with robbing and killing Freddie Lester, and charges against the other two boys were withdrawn.

The charges against Mr. Hurt were dismissed when, after he had spent ten days in juvenile detention, the court determined that there existed no credible evidence

POCAHONTAS COUNTY
CIRCUIT/FAMILY COURT
RECEIVED 3-4-13
by: CMC

1

against him. Mr. Hopkins eventually pled guilty to one count of *second* degree murder. Under Mr. Hopkins' plea agreement, he was required to provide testimony against Mr. Hurt. To gain the benefit of his bargain, he now claimed that Mr. Hurt was not only a participant but was the mastermind behind the murder.

Based upon Mr. Hopkins' claims, on December 11, 1996, Mr. Hurt was again charged by Juvenile Petition with aiding Mr. Hopkins in the murder of Freddie Lester. On December 20, 1996, a preliminary hearing was held in the Mercer County Magistrate Court, where probable cause was found to hold Mr. Hurt to answer for the killing. On December 23, 1996, Mr. Hurt was released on bond.

On January 13, 1997, Mercer County Prosecuting Attorney Charles Smith filed a Transfer Motion with the Mercer County Circuit Court. Although Mr. Hurt was never afforded an opportunity to be heard, his case was transferred to adult criminal jurisdiction and, on February 18, 1997, the Mercer County Grand Jury returned an Indictment against Mr. Hurt, charging him with murder and aggravated robbery. Trial was set for March 11, 1997.

At a hearing held before the Honorable John R. Frazier, on February 24, 1997, the Indictment was dismissed and the case was remanded back to juvenile jurisdiction. A discussion was held on the record regarding the transfer hearing. At this time, the court inquired of young Mr. Hurt whether he understood his rights and wished to waive them. After a very brief discussion with his Counsel, Mr. Hurt told the court that he wished to proceed in adult court. On June 10, 1997, Mr. Hurt was again indicted, and on June 16, 1997, he was arraigned. Trial was held in September, 1997. The jury hung, 10-2 in favor of acquittal. A mistrial was declared.

2

Despite Mr. Hurt's near-acquittal, Mr. Hurt's Counsel petitioned for a change of venue, citing the publicity attendant to the first trial. The change of venue was granted. The West Virginia Supreme Court chose Pocahontas County — virtually devoid of African Americans in the jury pool — for the retrial.

On December 22, 1997, new Counsel was appointed for Mr. Hurt.

Counsel for Mr. Hurt filed a motion to dismiss arguing that the Mercer County court erred in transferring Mr. Hurt from juvenile court to adult court. The motion was denied and the trial was set. On May 29, 1998, the jury found Mr. Hurt guilty of Murder in the *first* degree, with a recommendation of mercy.

During the trial, Mr. Hopkins stayed in the Pocahontas County jail as he waited to testify against Mr. Hurt. Others at the jail included Paul Jerome, Anthony Tharpe and Jeff "Bones" Sharp. Mr. Jerome and Mr. Tharpe later gave statements to the effect that Mr. Hopkins had told them he had acted alone in murdering Mr. Lester and that Mr. Hurt had had nothing to do with it. Mr. Sharp later made a similar statement. On June 12, 1998, motions for arrest of judgment and a new trial were denied. The motions included the statements of Mr. Jerome and Mr. Tharpe as new evidence. On July 16th, Mr. Hurt was sentenced to the Mount Olive correction facility for a term of life with mercy. On September 25, 1998, Counsel for Mr. Hurt filed an appeal to the West Virginia Supreme Court. The appeal was refused on June 3, 1999.

On September 14, 1999, Mr. Hurt's Counsel filed a *Habeas* Petition with the 11th Judicial Circuit. The Petition was denied on November 18th. Between the time the *Habeas* Petition was filed and the time it was denied, Mr. Hurt and Mr. Hopkins both

3

became inmates at Mt. Olive. At that time, Mr. Hopkins indicated to Mr. Hurt that he was remorseful over having falsely implicated him and was prepared to tell the truth: that he had acted alone and that Mr. Hurt had had nothing to do with the murder. Mr. Hopkins asked Mr. Hurt to contact his attorney and ask him to come to take a statement from him. Mr. Hurt's lawyer immediately met with Mr. Hopkins and recorded him stating that he had lied and that Mr. Hurt had had nothing to do with the murder. Mr. Hopkins also wrote a letter to Judge James Rowe, dated November 12, 1999, admitting that he had lied about Mr. Hurt's involvement. On February 18, 2000, the Court ordered Mr. Hurt's Counsel to file an amended *Habeas* Petition based on this new evidence. On January 19, 2001, a status hearing was held regarding the amended *Habeas* Petition. It was then determined that Counsel should be relieved and new Counsel appointed. In February of 2001, the Public Defender for Pocahontas County was assigned as Mr. Hurt's new Counsel to file an amended *Habeas* Petition. That Petition was ultimately denied by the Pocahontas Circuit Court. A subsequent federal *Habeas* Petition was also denied as it was determined that Mr. Hurt had not exhausted his state remedies.

In November of 2008, Mr. Hurt filed a second state *Habeas* Petition alleging a number of grounds related to ineffective assistance of his first *Habeas* Counsel. Following an evidentiary hearing, this Honorable Court issued an Order on June 10, 2010, in which it found that under the applicable state and federal standards, Mr. Hurt's first *Habeas* Counsel was, in fact, ineffective—"but for the unprofessional errors of Petitioner's previous habeas corpus counsel . . . there is a reasonable probability that the proceedings would have been different"—inasmuch as his *Habeas* Counsel failed to investigate or to

4

present corroborating evidence, which corroborating evidence was known to him, and the lack of which was material in Judge Rowe's denial of Mr. Hurt's 1999 *Habeas* Petition. This Court set aside the first *Habeas* Petition and its denial, decreed that no claims would be barred by *res judicata*, and directed the undersigned Counsel to file the instant *Habeas* Petition raising all possible issues, including those previously denied.

The undersigned Counsel did so, and following an Omnibus Hearing held on April 15, 2011, the Court entered an Order on April 18, 2011, granting *Habeas* relief and vacating the conviction. The Petitioner was released on bond.

The State appealed this Court's ruling. On November 9, 2012, the West Virginia Supreme Court of Appeals reversed this Court's ruling on the grounds that (1) Trial Counsel's failure to inform the Petitioner of his right not to testify was not prejudicial, and (2) the Court erred in determining that Mr. Hopkins was not a credible witness. The Court then remanded the case for an expanded Order containing specific findings of fact and conclusions of law on other issues that had been raised in the *Habeas* Petition. *Ballard v. Hurt*, 2012 WL 5478745, ___ W.Va. ___, ___ S.E.2d ___ (2012). This Order does so.

### I.
### Trial Counsel[1] Was Ineffective for Failing to Investigate the Petitioner's Alibi That He Was Not at the Crime Scene When Michael Hopkins, Acting Alone, Robbed and Murdered Freddie Lester

*A. Alibi*

At trial, Mr. Hurt asserted that he was home during the early morning hours of August 21, 1995, when Michael Hopkins was prowling the streets of Bluefield and

---

[1] At trial, Mr. Hurt was represented by two lawyers: Mr. Lusk and Mr. Fuda. Herein, they are referred to collectively as "Trial Counsel."

robbing and murdering Freddie Lester. He testified that on August 20, 1995, he got home around 11:00 p.m. and initiated a phone call to his girlfriend, Ginger Wheeler, around 11:30 p.m. Trial Transcript, pp. 547-551.

Ms. Wheeler testified at trial that from about 11:30 p.m. on August 20, 1995, until about 3:44 a.m. on August 21, 1995, she was on the phone with Mr. Hurt. Trial Transcript, pp. 529-531.

Mr. Hurt's mother, Juanita Hurt, testified at trial that Mr. Hurt had to have come home before midnight on August 20, 1995, because (a) his father locked the doors at midnight and Mr. Hurt, who didn't have a key, couldn't have gotten in the house after that hour and (b) Mr. Hurt was asleep in his bed the next morning. Trial Transcript, pp. 536-542.

. B.
*Phone Records*

That Mr. Hurt was on the telephone with Ms. Wheeler at the time of the robbery and murder might have been corroborated with telephone records. The Court file reflects that Mr. Hurt's Trial Counsel failed to have issued a subpoena to obtain those telephone records. The Court file also reflects that Trial Counsel did not even attempt to contact the telephone company to inquire about the availability of records. (In responding to a Complaint filed by Mr. Hurt with the Office of Disciplinary Counsel, Trial Counsel swore that he had "attempted 6 or 7 phone calls to Texas to prove that the call took place" but that he "was advised that the records were not kept for no longer than I believe 180 days." Trial Counsel submitted to the Office of Disciplinary Counsel records detailing telephone calls made from his office to numbers in the State of Texas,

6

where the telephone company was based. However, the record reflects that none of the Texas numbers dialed from Trial Counsel's office were assigned to the telephone company, and all of the telephone calls to Texas numbers were placed *after* Mr. Hurt had been tried and convicted. Thus, it is clear that Trial Counsel was dishonest with the Office of Disciplinary Counsel, as the documented calls to Texas could not have been made in the course of investigating Mr. Hurt's alibi.)

## C.
### *Recantations*

Mr. Hurt was convicted at trial based largely on the trial testimony of Michael Hopkins, which implicated Mr. Hurt in the crime. The West Virginia Supreme Court of Appeals has ruled that it is beyond the province of this Court to specifically pass judgment on Mr. Hopkins' credibility. *Ballard v. Hurt*, 2012 WL 5478745, ___ W.Va. ___, ___ S.E.2d ___ (2012). However, in the context of reviewing the effectiveness of Trial Counsel's performance with regard to his failure to investigate and corroborate Mr. Hurt's alibi, this Court must take note of Mr. Hopkins' wildly erratic record of accusing Mr. Hurt, repeatedly recanting those accusations, and of un-recanting his accusations.

Initially, Mr. Hopkins told the Bluefield Police that he knew who had murdered Mr. Lester, and he implicated three other individuals, including Mr. Hurt. On the basis of Mr. Hopkins' statement, Mr. Hurt, who is African American, and the two others— but not Mr. Hopkins—were charged. Subsequently, Mr. Hopkins confessed that *he* had shot and killed Freddie Lester and now claimed that Mr. Hurt was a participant but the other two juveniles he had falsely pointed the finger at were not. Mr. Hopkins was

7

charged with robbing and killing Freddie Lester and charges against the other two boys he acknowledged having falsely accused were dropped.

At trial, Mr. Hopkins stuck with his story that Mr. Hurt was a participant in the crime.

A sworn statement provided to the Court in connection with Mr. Hurt's first *Habeas* Petition, the entirety of which appears in the record of this case, given by Mr. Hopkins on October 7, 1999, contains the following:

> I left my mother's house by myself and went down to the Rich Oil Station and I purchased a couple of things, sat outside on the wall of the Rich Oil station by myself Then I attempted to rob, and I shot Freddie Lester . . . . [p.4.]
>
> I walked up behind Mr. Lester and I shot him . . . . [p.6.]
>
> I took the money out of his front, front shirt pocket, went in and grabbed the VCR tape . . . [b]ecause I knew I'd be on camera . . . . [p.7.]
>
> Davie Hurt had nothing to do with this, I falsely accused him of everything . . . . [p.14.]
>
> I lied and this man got 15 to life . . . . I didn't only destroyed [sic] his life, I destroyed his family's life. [Telling the truth now] is what God wants me to do . . . . [p.15.]
>
> I felt that the only way I was going to get that plea agreement is to testify against Davie that he had something to do with it . . . . [p.18.]
>
> I'm apologizing because I'm a man now and I know what I did was wrong . . . . [p.23]
>
> I'm a man now and I know that I lied against Davie Hurt, and I'm giving you this statement now because it's the truth . . . . [p.25.]
>
> They'd probably take my plea away from me, you know, and do other things, give me a lot more charges then . . . . [I]t doesn't matter, you know. You know, I, I, I destroyed a man's life. I took Mr. Lester's life. Not only did I take his life, I feel that I took Davie's life as well by him being in jail and to me, in order to do something right with all this chaos is by getting that man out of here and I do everything in my own power to do that. Even if it takes other charges and me doing life inside this penitentiary . . . . [pp.25-26.]

8

> I think about Mr. Lester all the time, how I took his life. Davie, ah, I destroyed his life. You know, it's always constantly on my mind, and I feel the only way to ever get over this is to get this man out of here . . . . Davie had nothing to do with this case at all. [p.29.]

A letter to the Court, written by Mr. Hopkins on November 12, 1999, reiterated Mr. Hopkins' guilt over killing Mr. Lester and over blaming Mr. Hurt. In that letter, which appears in the record of this case, Mr. Hopkins told the Court that he falsely accused Mr. Hurt because

> the Poleice [sic] just kept throwing his name at me as if they wanted me to say he was with me,[2] then later they said if I testified against him that I wouldn't do life, and that they would get me second degree . . . . They said if I didn't do it I would spend the rest of my life in prison and never see my moma [sic] or little girl again. So that's what I did never thinking of how wrong it really was.
>   So I did in 1997, in Mercer County in his trail [sic] but they didn't convict he had what they call a hung jury. At that trial the police told me what to say bud [sic] it didn't work and they were really mad at me. So then I was told that I would have to do it again later or they would take my plea back which ment [sic] I would have to do life without . . . . Well Davie got convicted there in your court and he got life with mercy. And since then I've been feeling really bad not only cause the poleice [sic] used me but because I took a man's life away who really did nonthing [sic]. I lied on Davie Hurt. I said that he told me to kill Mr. Freddie and how to do it. I said he was with me there and he really wasn't. Mr. Rowe I feel so bad for what I've done. I only thought about myself, and I know what I did was wrong . . . . I committed purgery [sic], and I need you to know that I'm willing to accept whatever comes along with telling the truth.

---

[2] It makes perfect sense that Bluefield Police officers would press Mr. Hopkins to accuse Mr. Hurt. Among the Bluefield officers who arrived at the scene to investigate the crime was K9 Officer John Bailey, who had, in December of 1992, violently beaten the juvenile Petitioner; as a result of that beating, the City of Bluefield was forced to make a substantial cash payment to young Mr. Hurt in settlement of this civil rights violation; bad blood continued to flow between Mr. Hurt and Officer Bailey.

9

A sworn Affidavit, signed by Mr. Hopkins on August 15, 2001, which appears in the record of this case, affirmed that

> Davie Hurt was charged with this robbery and killing as a result of me giving a false statement to the Bluefield Police Department, in which I claimed he was involved . . . [, t]hat in addition to giving the false statement to the Bluefield Police, I also testified falsely in the two trials of Davie Hurt . . . [, and t]hat Mr. Davie Hurt had no involvement, whatsoever, in the robbery of the "Red Head" station, or in the killing of Mr. Lester.

Mr. Hopkins, who has since been released on parole, testified at a hearing before this Court on April 15, 2011. At that hearing, Mr. Hopkins withdrew his previous impassioned recantations and again claimed that Mr. Hurt "was there with me" when he robbed and murdered Mr. Lester. Transcript, Hearing of April 15, 2011, p. 8.

## D.
### Discussion

Mr. Hurt presented an alibi as to his whereabouts at the time of the robbery and murder. This alibi was deemed by the trial judge, the Hon. James Rowe, to be uncorroborated, and in an earlier *Habeas* denial—since set aside by this Court—Judge Rowe stated that the lack of corroboration of Mr. Hurt's alibi was material to his denial of the Petitioner's *Habeas* action.

Mr. Hurt's alibi, Trial Transcript, pp. 547-551, and Ginger Wheeler's testimony at trial with regard to his alibi, Trial Transcript, pp. 529-531, could have been corroborated at trial, as it was corroborated in Mr. Hurt's second *Habeas* proceeding, had Trial Counsel undertaken an investigation and contacted Marsha and Barney Wheeler. Mr. and Mrs. Wheeler swore in affidavits received by this Court and, on April 16, 2010,

testified at an omnibus hearing before this Court, that their daughter was on the telephone at the time Mr. Hopkins was robbing and murdering Mr. Lester, just as Ginger Wheeler had testified at trial. Mr. Wheeler testified that his daughter was speaking on the phone to her boyfriend, Mr. Hurt.

Mr. and Mrs. Wheeler also testified that at no time prior to the denial of Mr. Hurt's first *Habeas* Petition had they been contacted by any police officer or attorney regarding this matter.

Mr. Hurt has asserted that he had asked his Trial Counsel to contact Mr. and Mrs. Wheeler. This assertion has gone unrebutted and, thus, stands in the record as true.

It also stands in the record as true that Trial Counsel failed to contact the telephone company, let alone subpoena records from the telephone company, that might have corroborated Mr. Hurt's alibi.

It also stands in the record as true that Mr. Hopkins has not been able to stick to one story about what happened on August 21, 1995, and that his recantation of his multiple, compelling, prior recantations was made at a time when he was out of prison on parole and risked being sent back to prison if he had testified differently than he had at trial.

The right to effective assistance of Counsel is guaranteed by the Sixth Amendment to the U.S. Constitution and Article III, Section 14 of the West Virginia Constitution. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

> Ineffective assistance of counsel is established when it is proved that counsel for a criminal defendant failed to investigate adequately a purported alibi defense and consequently failed to contact, subpoena and call alibi witnesses who were willing and able to testify for the

11

defendant in a case in which the alibi was the defendant's sole possible defense or a material defense.

Syl. pt. 2, *State v. Glover*, 177 W.Va. 650; 355 S.E.2d 631 (1987).

Claims of ineffective assistance of counsel require the application of a two-prong test as established in *Strickland, supra*: "(1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). *Miller* adopted the *Strickland* test in West Virginia, elaborating on it as follows:

> In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of . . . counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as . . . counsel acted in the case at issue.

Syl. pt. 6, *Miller*.

Based on the entirety of the record, the Court finds as a matter of law that Trial Counsel's failure to contact the Wheelers to corroborate Mr. Hurt's alibi, and his failure to investigate the existence of corroborative telephone records, were ineffective assistance of Counsel and satisfy the first prong of the *Strickland* test. Trial Counsel's failure was deficient under an objective standard of reasonableness and it cannot be written off as a matter of strategy; under the facts and circumstances of this case, there

could be no strategic reason for not seeking to obtain records to corroborate Mr. Hurt's whereabouts at the time Mr. Lester was being murdered.

In light of Mr. Hurt's near-acquittal by a Mercer County jury, it is reasonable to believe that had Trial Counsel investigated and presented to the Pocahontas County jury evidence—both testimonial and physical—to corroborate Mr. Hurt's alibi, the corroborated alibi would have persuaded the Pocahontas jury of Mr. Hurt's innocence. Thus, the second prong of *Strickland* has been satisfied in that there is a reasonable probability that, but for Trial Counsel's unprofessional error, the result of the proceedings would have been different. Therefore, under the *Strickland* test, Mr. Hurt was denied his Constitutional right to effective assistance of Counsel for his Trial Counsel's failure to "investigate adequately [his] alibi defense[,]" in contravention of his rights under the Sixth Amendment to the United States Constitution and Article 3, section 14 of the West Virginia Constitution.

The "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. pt. 3, *State v. Sheppard*, 172 W.Va. 656, 661, 310 S.E.2d 173, 178 (1983); syl. pt. 5, *State v. Boyd*, 160 W.Va. 234, 233 S.E.2d 710 (1977); syl. pt. 5, *State ex rel. Grob v. Blair*, 158 W.Va. 1647, 214 S.E.2d 330 (1975). Trial Counsel's failure to investigate Mr. Hurt's alibi was *not* harmless beyond a reasonable doubt.

## II.
### Trial Counsel Was Ineffective for Failing to Subpoena All Witnesses Necessary for an Adequate Defense

The record reflects that Trial Counsel obtained a subpoena for a defense witness, Wendell Rose, who had been subject to direct and cross examination at Mr. Hurt's first trial, and that he sent the subpoena out for service. That subpoena was not, in fact, served. The trial transcript reflects that Trial Counsel was unaware that the subpoena had not been served, although it also reflects that on day three he was aware that Mr. Rose had not appeared for trial on day one or day two. On the third and final day of trial, when Trial Counsel had intended to call Mr. Rose, he advised the Court that the witness had been subpoenaed, that a Return of Service had been filed, and that in the absence of this witness he wished to introduce Mr. Rose's testimony from the first trial.

> MR. LUSK: [I]n his absence, being lawfully subpoenaed to attend this proceeding, we would ask the Court for permission to read his prior testimony from the trial of September '97 conducted in Mercer County into the record in this case.

> \* \* \*

> MR. SADLER: We would object to that . . . . At no point did they tell us this is a witness we want to use. We haven't been able to find him . . . . Then they come in here this morning which is the anticipated last day of this trial, said, we can't find him, Judge. He just has not showed up any day. At no time have they informed the Court that this witness has not showed up or that he's unavailable.

> \* \* \*

> MR. LUSK: Your Honor, we had served him with a subpoena to compel him to be here . . . . We had anticipated that he would comply with the subpoena and be here. We've had no contact.

> \* \* \*

14

THE COURT: I note that—from the return of the subpoena, the Sheriff's return that was noted—in fact the judgment of the Court [is] that Mr. Rose was not served with the subpoena because the return itself indicates that the subpoena was left at his—in its typewritten form at his usual place of abode, leaving it with his mother. It also says that subject purportedly lives out of state, unavailable for service. If he wasn't living there, then the service is not effective. You don't leave a service process at the house where the person doesn't live. That does not constitute an effective service.

\* \* \*

MR. FUDA: Judge, its's [sic] my understanding an investigator served Mr. Rose's parents, that he worked out of the state. *I didn't know—of course, did not review the return.* They brought it into the office. I just mailed it up here.

\* \* \*

THE COURT: Let me inquire of defense counsel what other means, other than this service or this attempted service of this subpoena, have you used to try to get Mr. Rose to be here?

MR. FUDA: That's it, Judge. We just served him.

Trial Transcript, pp. 497-502. Emphasis added. Ultimately, the Trial Court refused to permit Mr. Rose's testimony to be put before the jury. Trial Transcript, pp. 599.

Much as Trial Counsel was disingenuous with the Office of Disciplinary Counsel over his assertion that he had contacted the telephone company's Texas office, which the record reflects he did not do, Trial Counsel was disingenuous with the Court over his assertion that Mr. Rose had been subpoenaed. (The *Habeas* record reflects Mr. Hurt's assertion that his court-appointed Trial Counsel explained to him that it was too expensive to bring all witnesses to Pocahontas County for trial and put them up in hotels. That assertion has gone unrebutted, thus it is accepted as true.)

15

Courts have long held that prior trial testimony is admissible upon retrial if the declarant becomes unavailable. *See, e.g., Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337 (1895); *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308 (1972). "The rule in West Virginia is that sworn testimony taken from a former trial or proceeding is admissible if there is (1) an inability to obtain the testimony of the witness, (2) an opportunity to cross-examine the witness in the former proceeding, and (3) a substantial identity of the parties and the issues." *State v. Goff*, 169 W.Va. 744, 745, 289 S.E.2d 467, 468 (1982). In *Goff*, as in this case, the trial court had rebuffed a defense motion to introduce sworn testimony from a first trial at a second trial. In *Goff* the witness whose testimony was offered was truly unavailable. The West Virginia Supreme Court, which reversed Mr. Goff's conviction on appeal due to the trial court's refusal to admit the prior testimony, made a finding that Mr. Goff's trial counsel, "although unsuccessful, was diligent in his efforts to secure the attendance of the missing witness." It is less clear here that Trial Counsel was diligent, as he was unaware that the witness had not, in fact, been properly subpoenaed, and didn't bother to notify the Court that the witness was absent until the last day of trial.

Certainly, if Mr. Rose had been legally unavailable, the presentation of his prior testimony to the jury would have been proper and the Court would have been in error in refusing to permit its presentation. This Court does not make a finding as to whether the Trial Court erred in its ruling, but it does find as a matter of law that Trial Counsel was ineffective in failing to effectively subpoena Mr. Rose and in being unaware that the return indicated improper service.

16

Claims of ineffective assistance of counsel require the application of a two-prong test as established in *Strickland v. Washington, supra*: "(1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. pt. 5, *State v. Miller, supra. Miller* adopted the *Strickland* test in West Virginia, elaborating on it as follows:

> In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of . . . counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as . . . counsel acted in the case at issue.

Syl. pt. 6, *Miller.*

Trial Counsel's failure to secure a necessary witness was deficient under an objective standard of reasonableness and it cannot be written off as a matter of strategy; under the facts and circumstances of this case, there could be no strategic reason for not even being aware that Mr. Rose had not been properly subpoenaed—he told the Court he hadn't even looked at the Return of Service—or, in the mistaken belief that service had been effectuated, not asking the Court to enforce its subpoena. That satisfies the first prong of the *Strickland* test.

In light of Mr. Hurt's near-acquittal by a Mercer County jury in his first trial, at which Mr. Rose did testify, it is a reasonable probability that had Trial Counsel secured this witness, or made diligent efforts to secure this witness, the result of the proceedings would

have been different. Either Mr. Rose would have testified live or the Trial Court would have been bound to find that Trial Counsel, although unsuccessful, was diligent in his efforts to secure the attendance of the missing witness, and—under Goff—would have been compelled to permit Mr. Rose's prior testimony into the record so the Pocahontas County jury could hear the same testimony that led the Mercer County Jury to very nearly acquit Mr. Hurt. Thus, the second prong of *Strickland* has been satisfied.

Therefore, under the *Strickland* test, Mr. Hurt was denied his Constitutional right to effective assistance of Counsel for his Trial Counsel's noted failures with regard to securing Mr. Rose as a witness, in contravention of his rights under the Sixth Amendment to the United States Constitution and Article 3, section 14 of the West Virginia Constitution.

The "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. pt. 3, *State v. Sheppard*, 172 W.Va. 656, 661, 310 S.E.2d 173, 178 (1983); syl. pt. 5, *State v. Boyd*, 160 W.Va. 234, 233 S.E.2d 710 (1977); syl. pt. 5, *State ex rel. Grob v. Blair*, 158 W.Va. 1647, 214 S.E.2d 330 (1975). Trial Counsel's noted failures with regard to securing Mr. Rose as a witness was *not* harmless beyond a reasonable doubt.

18

## III.
### Trial Counsel Was Ineffective for Failing to Object to State's Testimony From Two State Witnesses Who Had Not Been Timely Disclosed

Based on the entirety of the record, the Court finds as a matter of fact that Mr. Hurt's Trial Counsel failed to object at trial to the State's introduction of testimony from two State witnesses who had not been timely disclosed, contrary to the Trial Court's prior Order.

At trial, the State introduced testimony from witnesses Diane Gills and Cherry Mitchum. Trial Transcript pp. 147-168. Previously, at a status hearing held on January 14, 1998, the Trial Court had ruled that testimony from witnesses who had not been disclosed prior to the first trial would be disallowed at the second trial. Neither Diane Gills nor Cherry Mitchum had been disclosed as witnesses prior to the first trial. Upon objection from Trial Counsel, these witnesses would have been excluded from testifying at Mr. Hurt's second trial. Trial Counsel did not object to their testimony.

These non-disclosed witnesses were called by the State to bolster the claim of Mr. Lester's widow that Mr. Hurt came to her home after the murder and gave her information about the murder that only the murder could know. However, as the post-trial record reflects, the inside information these witnesses accused Mr. Hurt of having provided was in actuality information that had already been printed in the local newspaper. Transcript, Sentencing Hearing, July 16, 1998, p. 70.

That the jury took the testimony of these non-disclosed witnesses very seriously is evidenced by the fact that, during deliberations, the jury asked the Court for a transcript of the statements of these witnesses. Trial Transcript, p. 645.

Based on the entirety of the record, the Court finds as a matter of law that Trial Counsel's failure to object to this bolstering testimony from witnesses whose appearance at trial had previously been precluded by the Court was ineffective assistance of Counsel.

Claims of ineffective assistance of counsel require the application of a two-prong test as established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984): "(1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). *Miller* adopted the *Strickland* test in West Virginia, elaborating on it as follows:

> In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of . . . counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as . . . counsel acted in the case at issue.

Syl. pt. 6, *Miller*.

Counsel's failure to object to this bolstering testimony from witnesses whose appearance at trial had previously been precluded by the Court was detrimental to Mr. Hurt's defense, was deficient under an objective standard of reasonableness, and it cannot be written off as a matter of strategy; under the facts and circumstances of this case, there could be no strategic reason for not objecting to this bolstering testimony

from witnesses whose testimony the Trial Court had previously ruled would be disallowed. This satisfies the first prong of *Strickland*.

Further, there is a reasonable probability that, but for his Counsel's unprofessional error, the result of the proceedings would have been different, in light of Mr. Hurt's near-acquittal by a Mercer County jury in his first trial, at which Diane Gills and Cherry Mitchum did not testify. Thus, the second prong of *Strickland* has been satisfied.

Therefore, under the *Strickland* test, Mr. Hurt was denied effective assistance of counsel, in contravention of his rights under the Sixth Amendment to the United States Constitution and Article 3, section 14 of the West Virginia Constitution.

## IV.
### Trial Counsel Was Ineffective for Seeking a Change of Venue and For Not Objecting to the New Venue Selected

Trial Counsel requested a change of venue after the African American Petitioner's first trial, held in racially-diverse Mercer County, ended in a Hung Jury—ten to two in favor of acquittal. Trial Counsel did not object to Pocahontas County, virtually devoid of African American citizens, as the new venue. (Pursuant to Rule 201 of West Virginia's Rules of Evidence, the Court takes judicial notice of the 1990 United States Census, which reflects that African Americans comprised more than six percent (4,133 people, of whom 2,872 were over the age of 18) of the population of Mercer County while there were only 69 African Americans (only 56 of whom were over the age of 18) among the population of Pocahontas County, comprising less than one percent of the Pocahontas population.)

Under *Batson v. Kentucky*, 476 U.S. 79; 106 S. Ct. 1712 (1986)—which specifically prohibited a prosecutor from intentionally striking African American members of a jury

21

pool in the trial of an African American defendant without cause aside from the matter of race—the United States Supreme Court found generally that a jury is a body composed of the peers or equals of the person whose rights it is selected or summoned to determine and that a jury must be indifferently chosen to secure a defendant's right under the Fourteenth Amendment to protection of life and liberty against race prejudice. As the *Batson* Court noted, "total or seriously disproportionate exclusion of [African Americans] from jury venires . . . is itself such an 'unequal application of the law . . . as to show intentional discrimination . . . .'" Further, the *Batson* Court recognized that "a black defendant alleging that members of his race have been impermissibly excluded from the venire may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."

Here, the impermissible exclusion of African Americans in the jury pool occurred not at the hands of Pocahontas County authorities or the prosecuting attorney, but by the choice of Pocahontas County as the venue for retrial.

*Batson* had been the law of the land for twelve years at the time of Mr. Hurt's retrial. In light of all the circumstances, Trial Counsel's failure to raise a *Batson*-like challenge to the selection of Pocahontas County as venue for the retrial was clearly outside the broad range of professionally competent assistance, and a reasonable lawyer would have objected to Pocahontas County as the venue and would not have acted, under the circumstances, as Trial Counsel acted in this case.

22

While the *Miller* Court held that a trial attorney's strategic choices cannot typically be challenged in a *Habeas* proceeding, it also made clear that a determination must be made as to "whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance" and "whether a reasonable lawyer would have acted, under the circumstances, as . . . counsel acted in the case at issue." Thus, arguably "strategic" choices with no basis in logic should be ripe for an ineffective assistance claim if the "strategic" choices are, in fact, outside the broad range of professionally competent assistance and a *reasonable* lawyer would not have made the same "strategic" choices. The standard to be applied is that set forth in *Strickland, supra.*

Under an objective standard, this was outside the broad range of professionally competent assistance and Trial Counsel's choice cannot be deemed to be one that a reasonable lawyer would have made, under the circumstances of this case.

Further, once the request was made and granted—improvidently, as Trial Counsel had not shown good cause for a change of venue in light of the fact that Mr. Hurt's first Mercer County jury had very nearly acquitted him and it was clear that a fair jury had been, and could have been, assembled in Mercer County—Trial Counsel failed to object to the unsettling choice of Pocahontas County as the venue for the retrial of this matter following Mr. Hurt's near-acquittal in Mercer County.

The leading West Virginia case on this issue, *Keys v. Hey,* 164 W.Va. 132, 260 S.E.2d 837 (1979), indicates that the racial makeup of a venue to which venue is transferred is not to be considered. However, that case was decided more than thirty years ago, in an era that was less sensitive to racial concerns.

23

As has been noted more recently:

> Because it creates a new pool of jurors, the decision to change venue implicates important constitutional values underlying both the Sixth and the Fourteenth Amendments. The choice-of-venue decision, therefore, may cause harm to those values similar to the injuries caused by other forms of jury discrimination. To avoid these injuries, the choice-of-venue decision should be based on an approach that considers the fundamental constitutional principles of democracy, participation, and inclusion.

M. SHANARA GILBERT, "An Ounce of Prevention: A Constitutional Prescription for Choice of Venue in Racially Sensitive Criminal Cases," 67 *Tul. L. Rev.* 1855, 1888 (1993). And as Justice Thurgood Marshall, joined by Justice Brennan, wrote in a dissent to the U.S. Supreme Court's denial of certiorari in *Mallett v. Missouri*, 494 U.S. 1009, 110 S.Ct. 1308 (1990) (citing *Batson*), "Just as state prosecutors may not use peremptory challenges to exclude members of the defendant's race from the jury, state trial courts may not transfer venue of the trial to accomplish the same result by another means."

Trial Counsel's failure to challenge Pocahontas County as the new venue cannot be written off as a matter of strategy, as there could be no strategic reason for failing to raise such an essential issue. Further, in light of the near-acquittal in more ethnically-diverse Mercer County, there is a reasonable probability that, but for Trial Counsel's failure to raise this issue, the result of the proceedings would have been different. Thus, under the *Strickland* test, Mr. Hurt was denied effective assistance of counsel, in contravention of his rights under the Sixth Amendment to the United States Constitution and Article 3, section 14 of the West Virginia Constitution.

24

# V.

## Trial Counsel Was Ineffective for Conducting a Haphazard *Voir Dire,* Largely Ignoring Issues of Race in a Racially-Charged Community

Based on the entirety of the record, the Court finds that Mr. Hurt's Trial Counsel conducted a haphazard *voir dire* in which he failed to query the members of the all-white jury panel as to their membership in racist organizations such as the then-Pocahontas County-based National Alliance.[3]

The purpose of *voir dire* is to root out bias among prospective jurors. *See, e.g.,* syl. pt. 12, *State v. Foster,* 2007 WVSC 33323; syl. pt. 4, *State v. Mills,* 2007 WVSC 33340. Trial Counsel *briefly* raised the issue of race in *voir dire* when he noted that the jury panel was all White, that Mr. Lester was White, and that Mr. Hurt was Black, and asked if anyone on the panel would have a problem with that. He received no response and went no further. He did not inquire as to whether anyone on the panel was a member of The National Alliance or any other such local organization, or was related to, or was friends with, any member of The National Alliance or any other such local organization. Trial Counsel asked a total of fifteen (15) questions in *voir dire,* most of which were generic, many of which were duplicative. ("Is there any member of this panel that has a problem or would have a reluctance to return a verdict . . . ?" "At the end, when the dust settles,

---

[3] At the time of the trial, Pocahontas County was not only virtually devoid of African American Citizens but was also home to then-thriving neo-Nazi white supremacist organization, The National Alliance, which has been described thusly by the Anti-Defamation League: "The group's racist vision extends to its views on government. It decries 'the growth of mass democracy,' including 'the enfranchisement of women and of non-whites,' and favors a government that will 'reverse the racially devolutionary course of the last few millennia and keep it reversed.'" National Alliance—Extremism in America, http://www.adl.org/learn/ext_us/N_Alliance.asp. According to former Pocahontas County Sheriff Jerry Dale, more than 100 active members of the National Alliance—a number that greatly eclipsed the number of potential African American jurors—lived in the County. http://www.rickross.com/reference/alliance/alliance17.html.

twelve people are going to go to a jury room and deliberate this case. Would all of you welcome that responsibility?") Trial Transcript, pp. 19-24. No reasonably competent criminal defense attorney would have so outrageously ignored this key issue in *voir dire* or limit himself or herself to a total of fifteen (15) non-unique *voir dire* questions in a murder case.

Given that nearly fifteen years have passed since Mr. Hurt's retrial, it is impossible to know whether any members of the jury were, in fact, connected to any white supremacist group. Nevertheless, the failure of Mr. Hurt's Trial Counsel to make an inquiry is ineffective in and of itself. This failure was deficient under an objective standard of reasonableness and it cannot be written off as a matter of strategy; under the facts and circumstances of this case, there could be no strategic reason for so glaringly having failed to make such an inquiry. Further, there is a reasonable probability that, but for Trial Counsel's unprofessional error, the result of the proceedings would have been different, inasmuch as a prior jury in more racially-diverse Mercer County had voted 10-2 for acquittal. Thus, under the *Strickland* test, Mr. Hurt was denied effective assistance of counsel, in contravention of his rights under the Sixth Amendment to the United States Constitution and Article 3, section 14 of the West Virginia Constitution.

## VI.
### Trial Counsel Failed to Object to the State's Prejudicial Characterization of Mr. Hurt as Being a Drug Dealer, Which Assertion Was Not in Evidence

At trial, a witness named Eldon Muncy testified that Mr. Lester had told Mr. Hurt that he couldn't conduct any drug business on the gas station's telephone. To his

credit, Trial Counsel objected that the testimony was speculative. The objection was sustained, and the testimony was ordered stricken from the record. Trial Transcript, p. 175. However, during the closing argument, the State referred to this stricken testimony and the Trial Counsel failed to object. Trial Transcript, p. 648. Thus, the State was permitted to plant in the minds of the jurors that Mr. Hurt was a drug dealer, which cast him in a very negative light, despite the fact that this evidence had been excluded and that the State should not have been permitted to argue from facts not in the record. This was highly prejudicial.

The West Virginia Supreme Court has reversed convictions based on a prosecutor's prejudicial remarks in opening statements and closing arguments. *See, e.g.*, *State v. Stephens*, 206 W.Va. 420, 525 S.E.2d 301 (1999) (reversed based on the court's failure to grant a mistrial based on the prosecutor's suggestion to the jury that defense counsel believed his client was guilty); *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988) (the prosecutor's remarks in closing argument about the credibility of State witnesses were "fundamentally improper" and mandated reversal); *State v. Poore*, 226 W.Va. 727, 704 S.E.2d 727 (2010) (the prosecutor's description of the defendant as "a lazy and shiftless individual," and other aspersions, constituted error that required reversal); and, directly on point, syl. pt. 2 *State v. Critzer*, 167 W.Va. 655, 280 S.E.2d 288, 289 (1981) and syl., *State v. Moose*, 110 W.Va. 476, 158 S.E. 715 (1931) ("[I]t is a flagrant abuse of [a prosecutor's] position to refer, in his argument to the jury, to material facts outside the record, or not fairly deducible therefrom.").

27

The West Virginia Supreme Court has held that four factors should taken into account in determining whether an improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. Syl. pt. 5, *State v. Poore*, supra; syl. pt. 6, *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995).

In this case, the prosecutor's remarks misled the jury into believing that Mr. Hurt was a drug dealer, which was not in evidence, thus prejudicing the Petitioner; (2) the remarks were not extensive but were intentionally made after the exclusion of the speculative testimony on which they were based; (3) absent the remarks, the competent proof introduced to establish Mr. Hurt's guilt was not strong; and (4) the comments do appear to have been deliberately placed before the jury to improperly divert attention to a wholly extraneous matter.

Generally, "[i]n order to take advantage of remarks made during an opening statement or closing argument which are considered improper an objection must be made and counsel must request the court to instruct the jury to disregard them." *State v. Coulter*, 169 W.Va. 526, 530, 288 S.E.2d 819, 821 (1982) (citing *State v. Lewis*, 133 W.Va. 584, 57 S.E.2d 513 (1949); *State v. Files*, 125 W.Va. 243, 24 S.E.2d 233 (1942); *State v. Fisher*, 123 W.Va. 745, 18 S.E.2d 649 (1941)). Trial Counsel failed to object, and thus failed to

28

preserve the issue for appeal. Not only should Trial Counsel have objected, he should have sought a mistrial chargeable to the State.

Trial Counsel's failure to object to the State's improper characterization of Mr. Hurt as a drug dealer, arguing from testimony that had been ordered stricken from the record, and to seek a mistrial, was deficient under an objective standard of reasonableness and it cannot be written off as a matter of strategy; under the facts and circumstances of this case, there could be no strategic reason for failing to object to a prejudicial remark made by the State in closing argument, which remark was based on testimony that had been stricken from the record.

Further, there is a reasonable probability that, but for Trial Counsel's unprofessional error, the result of the proceedings would have been different, inasmuch as a mistrial might have been granted at the most, inasmuch as a limiting instruction should have been granted at the least, and inasmuch as a prior jury not subjected to the prosecutor's remark had voted 10-2 for acquittal. Thus, under the *Strickland* test, Mr. Hurt was denied effective assistance of counsel, in contravention of his rights under the Sixth Amendment to the United States Constitution and Article 3, section 14 of the West Virginia Constitution.

## VII
### Trial Counsel's Cumulative Errors Constituted Ineffective Assistance of Counsel

As previously set forth herein, Trial Counsel's failings in this case were numerous. Individually, for the reasons heretofore stated, each constituted ineffective assistance of counsel under the two-pronged *Strickland* standard:

29

- Trial Counsel was ineffective in failing to contact Marsha and Barney Wheeler to corroborate Mr. Hurt's alibi;

- Trial Counsel was ineffective in failing to investigate the existence of telephone records to corroborate Mr. Hurt's alibi;

- Trial Counsel was ineffective in failing to secure a necessary witness, and in being completely unaware that the witness had not even been properly subpoenaed;

- Trial Counsel was ineffective in failing to object to the bolstering testimony from two witnesses whose appearance at trial had previously been precluded by the Court;

- Trial Counsel was ineffective for seeking a change of venue and for not objecting to the new, racially homogenous, venue that was selected; and

- Trial Counsel was ineffective for failing to object to the State's closing argument, based on speculative testimony that had been ordered stricken from the record, prejudicially characterizing Mr. Hurt as a drug dealer.

In addition, the West Virginia Supreme Court of Appeals has previously found that Trial Counsel was ineffective in failing to inform Mr. Hurt of his *Neuman* rights with regard to testifying or not testifying at trial, although it found that this deficiency, standing alone, was harmless. *Ballard v. Hurt, supra.*

However, the cumulative effect of all of these errors was clearly and egregiously prejudicial to Mr. Hurt. Add to these errors the fact that two of Mr. Hurt's lawyers—Mr.

Lusk and Mr. Tatano—have been disbarred and it is clear that Mr. Hurt has not been well-served by the legal profession.

The West Virginia Supreme Court has held that

> [w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error.

Syl. pt. 11, *State v. Cecil*, 221 W.Va. 495, 655 S.E.2d 517 (2007); Syl. pt. 5, *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972).

Based on the entirety of the record, the Court finds as a matter of law that the cumulative failings of Mr. Hurt's Trial Counsel were deficient under an objective standard of reasonableness and cannot be written off as matters of strategy. Further, for the reasons set forth under each of the previous numbered headings, there is a reasonable probability that, but for Trial Counsel's cumulative unprofessional errors, the result of the proceedings would have been different. Thus, under the *Strickland* test, Mr. Hurt was denied effective assistance of counsel, in contravention of his rights under the Sixth Amendment to the United States Constitution and Article 3, section 14 of the West Virginia Constitution.

## VIII
### Conclusion

Wherefore, based upon all the foregoing, it is ORDERED that the Petitioner's Conviction herein is VACATED.

The objection of the State is noted.

The Clerk shall provide certified copies of this Order to all Parties and Counsel.

31

ENTERED this 21ˢᵗ day of _February_, 2013.

_J. C. Pomponio_
Joseph Pomponio, Judge

Prepared by:

_____

Richard E. Holicker
Counsel for Petitioner
W.Va. Bar ID No. 7173
PO Box 2827
Charleston, West Virginia 25330

Inspected by:

_____

Scott A. Ash, Esq.
Mercer County Prosecuting Attorney
W.Va. Bar ID No. 172
120 Scott St
Mercer County
Princeton, WV 24740

A TRUE COPY, Certified this _____
day of _March_, 20 _13_
_____, Clerk
POCAHONTAS COUNTY CIRCUIT/FAMILY COURT
Marlinton, West Virginia 24954

32