**FILED**

**June 8, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0169—*Goodman v. Searls, Superintendent*

WOOTON, J., dissenting:

As the United States Court of Appeals for the Fourth Circuit once cautioned, "[t]olerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another." *Griffin v. Warden, Md. Corr. Adjustment Ctr.*, 970 F.2d 1355, 1359 (4th Cir. 1992). In denying habeas relief to petitioner Kevin Goodman, Jr., the majority patently ignores its own precedent, as well as Fourth Circuit caselaw granting federal habeas relief under nearly identical circumstances—all under the guise of imagined "tactical reasons" excusing trial counsel's ineffective assistance. Because the cumulative effect of counsel's failure to introduce a potentially exculpatory photo, coupled with his failure to request mandatory jury instructions squarely implicating the State's only evidence against petitioner, I respectfully dissent to the majority's conclusion that petitioner suffered no ineffective assistance of counsel and would grant habeas relief.[1]

Petitioner was indicted on charges stemming from the robbery of Andrew Gunn and his family, along with four other accomplices—Antwyn Gibbs, Radee Hill, Kentrell Goodman (petitioner's brother), and Rashod Wicker (petitioner's cousin). Petitioner was tried as a co-defendant with Gibbs and Hill. Goodman and Wicker (hereinafter "the accomplices") entered plea agreements prior to trial and testified against

---

[1] I do not, however, take issue with the majority's conclusion that the State did not proffer perjured testimony at trial.

1

petitioner and his co-defendants. The jury was informed, through testimony and introduction of the plea agreements themselves, that the accomplices had entered guilty pleas and that, in exchange, the State agreed to recommend youthful offender treatment at sentencing.

At trial, the State offered evidence that petitioner, the co-defendants, and the alleged accomplices—Goodman and Wicker—plotted to rob Andrew Gunn, an acquaintance of Goodman's who lived in Oak Hill, West Virginia. Testimony at trial indicated that shortly after midnight on January 9, 2015, the group departed South Carolina (where they all lived), in an Acura belonging to Kentrell Goodman's girlfriend, Lindsay Hess. Upon arrival in Oak Hill the group allegedly used weapons to enter the home owned and occupied by Elwood and Linda Knight (Mr. Gunn's grandparents) and stole a safe containing $9,000, a crossbow, and two pairs of sneakers, all belonging to Mr. Gunn.

The material evidence against petitioner consisted of 1) Ms. Hess' testimony that a couple of weeks prior to the crime while in South Carolina at "Aunt Benita's" house (where she, Goodman, and a friend named "Tamika" resided), she overheard petitioner and accomplice Goodman discussing robbing Mr. Gunn; 2) Ms. Hess' testimony that "Tamika" told her petitioner was in West Virginia in the early morning hours preceding the crime, which she then relayed to petitioner's girlfriend, Courtney Curry, via text; 3) the testimony of the alleged accomplices that petitioner accompanied them to West Virginia and

2

participated in the robbery; and 4) Mr. Gunn's testimony that petitioner was one of the perpetrators.[2]

In sum, the evidence that petitioner was an actual participant in the subject robbery consisted of 1) the testimony of the two alleged accomplices who pled guilty to the crimes at issue and testified extensively about their belief that they would be afforded preferential sentencing treatment for testifying at petitioner's trial; 2) the testimony of one accomplice's girlfriend, who testified that she overheard the accomplice and petitioner discussing the robbery, and that another woman—*who did not appear at trial*—told her that petitioner was in West Virginia at the time of the crime;[3] and 3) the identification of petitioner by a victim—a lifelong friend of one of the accomplices—whose identification of petitioner was so incredible the State later disavowed and urged the jury to disregard it.

---

[2] At trial, petitioner testified on his own behalf and was provided an alibi by Ms. Curry. Petitioner testified that he was at Aunt Benita's house on the evening at issue as part of a family get-together and became drunk, deciding to stay there on a couch overnight. Petitioner denied accompanying the others to West Virginia, but rather, was asleep at Aunt Benita's all night. When he awoke the next morning, Ms. Curry returned to Aunt Benita's, where she discovered petitioner, and they argued about Ms. Hess' text stating he was in West Virginia. Ms. Curry confirmed that the group was together until late the preceding night, but she left to return to the home she shared with petitioner because she had kids who had school the next morning. She returned to Aunt Benita's after 8:30 a.m. the next day—while the others were in West Virginia committing the robbery—where she found petitioner and argued about why Ms. Hess had stated he was in West Virginia, believing that petitioner had asked Ms. Hess to lie about his whereabouts.

[3] The majority emphasizes the State's point on cross-examination that petitioner called none of the other occupants of Aunt Benita's house to testify that he was there and not in West Virginia at the time of the crime. However, it fails to similarly credit petitioner's counsel's point that the State likewise did not call any of these witnesses to confirm that petitioner was *not* at Aunt Benita's house.

3

It is undisputed that no physical or forensic evidence connecting petitioner to the crime was uncovered, despite analysis of shell casings, pieces of the safe which was broken apart, fingerprints and shoe prints, cell phones, and searches of the various residences.

Notwithstanding the State's case against petitioner being based almost exclusively on accomplice testimony, petitioner's trial counsel—who was participating in his first jury trial—inexplicably failed to request *two mandatory* jury instructions. The instructions would have advised the jury that 1) the accomplices' testimony must be viewed "with caution"; and 2) the accomplices' guilty pleas could not be considered as evidence of petitioner's guilt. Trial counsel provided absolutely no rationale for failing to request the instructions and denied that there was any strategic reason for failing to do so. Petitioner's trial counsel further admitted that a photograph culled from video evidence he was provided during discovery appears to demonstrate that petitioner was not even in the Acura as the group departed the crime scene to return to South Carolina. Trial counsel offered no explanation whatsoever for why he failed to notice the photograph or video among the discovery he was provided. Remarkably, the State admitted below that the photograph appears to show that there was "probably" only one person is in the back of the vehicle, despite the group allegedly consisting of five male members.[4]

---

[4] In answer to petitioner's habeas petition below, the State indicated: "[I]t could fairly be argued that there is probably only one person in the back seat of the vehicle in question."

In spite of these extraordinary undisputed facts, the majority has determined that there was no deficiency of trial counsel in any event. It does so despite this Court having previously found the exact same instructional omission to be ineffective and manufactures purely hypothetical strategic reasons for the omission, which trial counsel himself denied. The majority renders this opinion in the face of nearly identical federal caselaw which it fails to acknowledge or distinguish.

1.      COUNSEL'S FAILURE TO REQUEST *HUMPHREYS/BOLLING* INSTRUCTION

The first instruction petitioner's trial counsel failed to request is a *Humphreys/Bolling* instruction, which advises the jury that the uncorroborated testimony of an accomplice must be viewed with caution.[5] Accomplice testimony is so fraught with danger that there is a split among jurisdictions as to whether convictions may be based on such testimony where it is uncorroborated. West Virginia has chosen to permit it, but with the important "corollary . . . rule" that a *Humphreys* instruction be given. *State v. Vance,* 164 W. Va. 216, 220, 262 S.E.2d 423, 426 (1980); *see State ex rel. Franklin v. McBride*, 226 W. Va. 375, 381, 701 S.E.2d 97, 103 (2009) (footnote omitted) ("A *Humphreys* instruction is required when an accomplice to the crime testifies for the State.").

---

[5] The syllabus point at issue originated as syllabus point one of *State v. Humphreys*, 128 W. Va. 370, 36 S.E.2d 469 (1945), and is quoted as syllabus point two of *State v. Bolling*, 162 W. Va. 103, 246 S.E.2d 631 (1978).

In *Humphreys*, the Court held: "Conviction for a crime may be had upon the uncorroborated testimony of an accomplice; but in such case the testimony *must be received with caution* and the jury should, upon request, be so instructed. . . . " 128 W.Va. 370, 36 S.E.2d 469, syl. pt. 1, in part (emphasis added); *see Bolling*, 162 W. Va. 103, 246 S.E.2d 631, syl. pt. 2 (same); *Vance*, 164 W. Va. 216, 262 S.E.2d 423, syl. pt. 2 ("Where the accomplice's testimony is uncorroborated, a criminal defendant is entitled to a jury instruction that such testimony should be received with great caution."); Syl. Pt. 3, *State v. Spadafore*, 159 W.Va. 236, 220 S.E.2d 655 (1975) ("As a general rule, West Virginia courts are not permitted to comment on the weight of the evidence; however, there is an exception entitling the defendant to an instruction that the uncorroborated testimony of a co-conspirator should be received with great caution when such testimony has a tendency to inculpate the accused."). The importance of a *Humphreys/Bolling* instruction has been explained: "The reasoning behind [the rule] is that in implicating the defendant, the accomplice may well have an ulterior motive [of] revenge or the promise or hope of leniency in his case, whether by way of lighter sentence, probation, early parole or outright release." *Vance,* 164 W. Va. at 220, 262 S.E.2d at 426.

As to the necessity of the instruction where the accomplice testimony is uncorroborated, the Court has elaborated on what the term "uncorroborated" contemplates: "Where the testimony of an accomplice is *corroborated in material facts which tend to connect the accused with the crime, sufficient to warrant the jury in crediting the truth of the accomplice's testimony*, it is not error to refuse a cautionary instruction." *Id*., syl. pt.

6

3, in part (emphasis added). It is on this basis that the majority finds that failure to request the instruction was not ineffective assistance of counsel. The majority adopts the circuit court's position[6] that the accomplices' testimony was corroborated by 1) each other's testimony; 2) Ms. Hess' testimony about an overheard conversation which occurred *before* the crime; and 3) her testimony that she saw petitioner near the victim's safe at someone else's home *after* the robbery.

The majority grasps at straws to establish corroboration to excuse the absence of the *Humphreys/Bolling* instruction. None of the evidence cited by the majority constitutes *corroboration of petitioner's actual participation in the robbery*. First, the two accomplices cannot corroborate each other, as this Court recognized in *Vance*: "It appears to be the general rule that . . . one accomplice ordinarily may not corroborate another[.]" *Id*. at 223 n.6, 262 S.E.2d at 428 n.6; *see also Arnold v. United States,* 94 F.2d 499, 506 (10th Cir. 1938) ("[O]ne accomplice cannot corroborate another accomplice[.]"); *Wisto v. Adams*, No. CV1703216VBFAFM, 2018 WL 2382154, at *10 (C.D. Cal. Feb. 7, 2018) ("The testimony of an accomplice cannot be corroborated by that of another accomplice."); *Childers v. Dir., TDCJ-CID*, No. CIV.A.6:06CV387, 2007 WL 666794, at *2 (E.D. Tex. Feb. 28, 2007) ("[A]ccomplice witness and confidential informant could not corroborate

---

[6] The circuit court also found that the accomplices' testimony was corroborated not only by each other, but by Ms. Knight and Mr. Gunn's identifications of petitioner and the "physical and technical" evidence. The majority does not mention these findings, plainly recognizing that 1) Ms. Knight never identified petitioner as a participant; 2) Mr. Gunn's identification was so incredible that not even the State would argue it was corroborative; and 3) there simply was no "physical" or "technical" evidence tying petitioner to the crime.

each others['] testimony."); *People v. Tewksbury*, 544 P.2d 1335, 1339 (1976) ("[R]equired corroboration must come from a source other than another accomplice.").

Second, being overheard discussing a theoretical robbery is no more corroborative of *actually participating* in the robbery than a person later being seen "near" evidence at another participant's home. As all of the witnesses made clear, this particular group of individuals lived and frequently socialized with and around each other. Neither the overheard conversation nor petitioner's subsequent proximity to other admitted participants bears any relevance to whether he actually participated. Finally, perhaps in the absence of any more compelling corroborative evidence, the majority inexplicably identifies physical evidence found at a *co-defendant's* house as somehow corroborative of *petitioner's* guilt. These scraps of testimony, which only tangentially associate petitioner with other admitted participants in the crime, are hardly the stuff of corroboration. Therefore, a *Humphreys/Bolling* instruction was mandatory. *Cf. United States v. Lee*, 506 F.2d 111, 121 (D.C. Cir. 1974) ("[A] cautionary instruction was required where there was no corroboration, or only minor corroboration that still left the government's case hanging almost entirely on informant testimony[.]" (footnote omitted)).

In fact, the absence of a functionally equivalent "informant instruction" justified habeas relief in a remarkably similar case decided by the Fourth Circuit. In *United States v. Luck*, 611 F.3d 183 (4th Cir. 2010), Luck was tried on charges stemming from allegations of possession of cocaine with intent to deliver. *Id*. at 184. The government's

case was premised on the testimony of an investigating officer and two paid informants. *Id.* Upon conviction, Luck sought habeas relief from the district court based, in part, on his trial counsel's failure to request an informant instruction, among other deficiencies. *Id.* at 185. Notably, the Fourth Circuit found it unnecessary to address any of Luck's other allegations of ineffective assistance, finding that the failure to request the informant instruction *alone* was sufficient to overturn his conviction. *Id.* at 186.

The federal informant instruction reads nearly identical to this Court's *Humphreys/Bolling* instruction and states, in part: "The testimony of an informer who provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication, must be examined and weighed by the jury with greater care than the testimony of an ordinary witness." *Id.*; *see also Lee,* 506 F.2d at 121 ("In general, the various types of shabby witnesses-the accomplices, informers, false friends . . . are governed by similar rules" pertaining to cautionary instructions); *Toliver v. United States*, No. 2:08CR22, 2013 WL 12343712, at *4 (E.D. Va. May 9, 2013) (likening "accomplice jury instruction" to "informant jury instruction" for purposes of examining ineffective assistance of counsel claim).[7] However, unlike this Court, the Fourth Circuit has not yet determined that an informant instruction is even mandatory. *See Luck*, 611 F.3d

---

[7] *See* 1A Fed. Jury Prac. & Instr. § 15:02 (6th ed.), 1A Fed. Jury Prac. & Instr. § 15:02 (6th ed.) ("The testimony of an informant, someone who provides evidence against someone else for money or to escape punishment for [his] [her] own misdeeds or crimes or for other personal reason or advantage, must be examined and weighed by the jury with greater care than the testimony of a witness who is not so motivated.")

at 187. The *Luck* court nevertheless noted cases from other circuits finding that the instruction was mandatory where the testimony was otherwise uncorroborated, just as in West Virginia. 611 F.3d at 187-88.

The Fourth Circuit found that the informants' testimony in *Luck* warranted such an instruction where, just as in the case at bar, the witnesses offered to "testify in return for certain benefits" including "time off of [an informant's] robbery sentence[.]" *Id*. at 188. Finding that "there was little corroborating evidence beyond the informants' testimony[,]" the court concluded that "a reasonable attorney would have requested an informant instruction." *Id*. The court further found that "there is no indication that failing to request the instruction had any root in trial strategy[]" because "Luck's counsel cross-examined both [informants] about the consideration they received from the government for their investigation and testimony." *Id*. Just as in the instant case, "Luck's counsel's defense strategy [was] . . . focused on discrediting the government's witnesses[.]" *Id*. Accordingly, the Fourth Circuit had little difficulty in finding counsel's failure to request the instruction ineffective: "There is no debate that in a case like this where the government produces very little evidence beyond the uncorroborated testimony of paid informants, an informant instruction should have been given." *Id*. at 189.

Further, the *Luck* court expressly rejected the excuse offered by the majority herein: that a general credibility instruction serves as an adequate substitute for the accomplice or informant instruction. Considering "whether giving the informant

10

instruction could have reasonably changed the probability of the outcome of the trial when the district court gave a general credibility instruction[,]" the *Luck* court handily rejected this defense explaining,

> [i]t is true that the district court's general instructions on witness credibility contained all of the elements of the informant instruction. However, the informant instruction is *sui generis*; *it alerts jurors to the potentially unique problems that inhere where an individual is paid to inculpate a defendant. Cf. Anty*, 203 F.3d at 310 (citing Edward H. Devitt et al., *Federal Jury Practice and Instructions* § 15.02 (4th ed.1992)) (discussing the creation of the special credibility instruction as one of the reasons why paid informant testimony may be considered). *By summarizing the tools that the jury must use to evaluate credibility and applying it specifically to the case of the informant, the instruction more effectively cautions the jurors to think closely about the testimony. See* Natapoff at 198 ("Jury instructions are a classic and crucial vehicle for shaping verdicts. Because jurors are the ultimate fact finders in criminal trials, charged with the task of evaluating witness credibility and figuring out what "really" happened, their evaluation of the informant testimony is central to the criminal process.").

611 F.3d at 189-90 (emphasis added); *see also Carter v. Kentucky*, 450 U.S. 288, 304 (1981) ("The other trial instructions and arguments of counsel that the . . . jurors heard at the trial" cannot "substitute for [an] explicit instruction.").

The *Luck* court had scarcely more difficulty in finding prejudice under the second prong of *Strickland*.[8] Because the informant instruction was clearly warranted and

---

[8] *See Strickland v. Washington*, 466 U.S. 668, 669 (1984) ("With regard to the required showing of prejudice, the proper standard requires the defendant to show that there (continued . . .)

11

there was no tactical reason for failing to request it, the court placed into perspective the absence of the instruction on Luck's defense. Again, in a narrative which could be lifted from the pages of the instant case, the *Luck* court stated:

> The government's case was built entirely on a foundation of paid informant testimony. There was minimal physical evidence. No government agent had ever observed Luck engaged in drug activity. *Merely giving general instructions as to witness credibility is not sufficient to give confidence that the outcome was not tainted by prejudice.* In this case in particular, there was a significant incentive for the government's two main witnesses to give testimony for their own benefit, both in terms of financial compensation and a reduction in sentence.

611 F.3d at 190 (emphasis added). In stark contrast to the "confiden[ce] [that] the adversarial process worked adequately" expressed by the majority despite the absence of this critical instruction, the *Luck* court concluded that

> Luck's trial counsel was ineffective when he failed to request an informant instruction when it would have been reversible error for the court to refuse to give it if requested, and that ineffectiveness prejudiced the outcome of Luck's trial because the jury was not cautioned to consider the special problems of credibility posed by the government's paid informants.

*Id.*; *see also United States v. Bernard*, 625 F.2d 854, 857 (9th Cir. 1980) (noting cases finding "refusal to give special instructions on the testimony of an accomplice when that testimony is important to the case" reversible error where "the defendant's guilt rested

---

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.").

12

almost entirely on the testimony of the accomplice, and the other evidence linking the defendant to the criminal activity was weak." (citing *United States v. Davis*, 439 F.2d 1105 (9th Cir. 1971)).

As our Federal Circuit has concluded, the failure to request a *Humphreys/Bolling*-type cautionary instruction is fatal to effective assistance of counsel where accomplice testimony is uncorroborated to any meaningful degree and forms the primary basis of the case against a defendant. As the *Luck* court stated, "[i]f there was ever a time to ask to have the jury instructed that paid informants [or accomplices] raise special issues about credibility, this was the case." *Id*. at 188. This same omission in the instant case is sufficient alone to warrant habeas relief to petitioner.

2.  COUNSEL'S FAILURE TO REQUEST *CAUDILL/FLACK* INSTRUCTION

The second mandatory instruction petitioner's trial counsel failed to request without explanation is a *Caudill/Flack* instruction, which prohibits the jury from using an accomplice's guilty plea as evidence of the defendant's guilt.[9] *Caudill* holds that an accomplice may testify to having entered a guilty plea to the crime of which a defendant is charged only "where such testimony is not for the purpose of proving the guilt of the defendant and is relevant to the issue of the witness-accomplice's credibility." *See* 170 W.

---

[9] *See* Syl., *State v. Flack*, 232 W. Va. 708, 753 S.E.2d 761 (2013) ("*Flack I*"). The syllabus point at issue was a modification of syllabus point three of *State v. Caudill*, 170 W. Va. 74, 289 S.E.2d 748 (1982).

Va. 74, 289 S.E.2d 748, syl. pt. 3. However, as a critical corollary to this evidentiary rule, *Caudill* made *mandatory* an instruction cautioning the jury that the accomplice's testimony should be limited to credibility and not used as inferential proof of the defendant's guilt. *Id*.

In *Flack I*, however, the Court modified that holding slightly to require that a defendant must first request such an instruction because, for tactical reasons, defense counsel may not want to draw unnecessary attention to the accomplices' guilty plea with an instruction: "Defense counsel may have ample reason to get beyond an accomplice's damaging testimony as quickly as possible. Whether the trial court should instruct the jury how the accomplice's testimony could, or could not, be considered is a matter best left to the discretion of defense counsel." 232 W. Va. at 714, 753 S.E.2d at 767. Accordingly, it modified *Caudill* and the requirement of a cautionary instruction about an accomplice's guilty plea to require counsel to first request it to avoid unnecessarily interfering with counsel's trial strategy:

> An accomplice who has entered a plea of guilty to the same crime charged against the defendant may testify as a witness on behalf of the State. However, if the jury learns of the accomplice's guilty plea, then *upon the motion of the defendant, the trial court must instruct the jury that the accomplice's plea of guilty cannot be considered as proving the guilt of the defendant,* and may only be considered for proper evidentiary purposes such as to impeach trial testimony or to reflect on a witness' credibility. The failure of the trial court, *upon request*, to give such a limiting jury instruction is reversible error.

14

*Id.*, Syl., in part (emphasis added). Because Flack's counsel did not request such an instruction, the *Flack I* Court found no error on *direct appeal.*

However, in Flack's subsequent habeas petition he asserted ineffective assistance of counsel based on his counsel's failure to request such a cautionary instruction, just as in the instant case. *See Flack v. Ballard,* 239 W. Va. 566, 579, 803 S.E.2d 536, 549 (2017) ("*Flack II*"). Importantly, this Court found counsel "deficient under an objective standard of reasonableness" for counsel's failure to request a *Caudill/Flack* instruction. *Id.* at 579, 803 S.E.2d at 549 (footnote omitted). However, under *identical* circumstances in the case at bar—which the majority herein notes is "eeri[ly] similar[]"—it somehow finds no deficiency. The majority's analysis regarding a *Caudill/Flack* instruction is simply mystifying. It declares that in failing to request the instruction, trial counsel "made a calculated decision by a reasonable lawyer standard[.]" However, in the habeas proceedings below, trial counsel offered *no explanation whatsoever* for why he did not request the instruction. In fact, counsel was directly asked: "Was there any conceivable strategic reason for not asking for any of these cautionary instructions to the Court?" His response was: ". . . [N]o."

Further, the majority conjures an entirely hypothetical strategy debate about trial counsel "mak[ing] the decision between drawing more attention to the damaging accomplice testimony or getting the possible benefit" of the instruction. It speculates that counsel "*may have* decided to move past the damaging testimony as quickly as possible."

15

(Emphasis added). Seemingly as though trial counsel did not even testify in the habeas proceeding, the majority simply imagines what might have been going through counsel's mind. However, trial counsel was thoroughly examined in the habeas proceeding below and directly questioned about the instructions. He offered no testimony whatsoever to suggest he made a tactical decision not to request the instruction to avoid "drawing more attention" to the accomplice testimony, and in fact flatly denied "any conceivable strategic reason" for failing to do so.

Manufactured "tactical reasons" are not sufficient to ward off a habeas claim. Further, "strategy" cannot be contrived from mere oversight. *See Wiggins v. Smith,* 539 U.S. 510, 526 (2003) (finding ineffective assistance where "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from *inattention, not reasoned strategic judgment.*" (emphasis added)); *Hargrave v. Landon*, 584 F. Supp. 302, 310 (E.D. Va. 1984), *aff'd*, 751 F.2d 379 (4th Cir. 1984) (distinguishing trial tactics from "attorney error which evinces ignorance or oversight"); *Person v. Rawski*, No. CV 4:15-4606-RMG, 2017 WL 1319778, at *4 (D.S.C. Apr. 10, 2017), *dismissed*, 692 F. App'x 147 (4th Cir. 2017) (the presumption of strategy "however, is not absolute where the purported strategic decision is based upon an error or ignorance of the law by trial counsel.").

In that regard, with respect to allegedly deficient trial tactics, "[t]he question is one of counsel's motivation[.]" *Hargrave*, 584 F. Supp. at 310. Here, counsel quite

16

simply offered no motivation. The Fourth Circuit has made clear that the "tactical decision" defense to ineffective assistance cannot be presumed or fabricated from a silent record: "'[C]ourts should not conjure up tactical decisions an attorney could have made, but plainly did not.'" *Tice v. Johnson*, 647 F.3d 87, 105 (4th Cir. 2011) (quoting *Griffin*, 970 F.2d at 1358. In a markedly similar case, the Fourth Circuit disavowed a state court's attempt to manufacture a tactical defense for counsel from a silent record, stating:

> [T]he "cogent tactical considerations" that the state court bestowed on David for failing to present Griffin's alibi witnesses are exercises in retrospective sophistry. From the attorney's perspective at the time of trial, *no reasonable excuse* for failing to notify the state of Griffin's alibi and to secure the attendance of alibi witnesses *appears or is even suggested in the evidentiary record.* Indeed, David's statements at the bench conference are *unambiguous admissions of unpardonable neglect.*

*Griffin*, 970 F.2d at 1358 (emphasis added); *accord Luchenburg v. Smith*, 79 F.3d 388, 392-93 (4th Cir. 1996) (finding failure to request mandatory jury instruction constituted ineffective assistance of counsel and stating that "counsel made no tactical 'choice,' unless a failure to become informed of the law affecting his client can be so considered.").

Here, not only is a tactical basis wholly absent from the appendix record, but the notion that counsel failed to request these instructions for strategic reasons flies directly in the face of trial counsel's entire defense strategy. Just as in *Luck*, petitioner's counsel's focus on the accomplices' lack of credibility due to their guilty pleas and assurances made by the prosecutor as to their sentencing makes it clear that "there is no indication that failing to request the instruction had any root in trial strategy[.]" *Luck*, 611 F.3d at 188. However,

17

nowhere does the majority examine the omission of the instructions in view of the overall case and defense, having satisfied itself with the mere possibility that an unidentified trial tactic adequately explained the omission.

The importance of the analysis the majority fails to undertake is best demonstrated in *Flack II* itself. The *Flack II* Court found the failure to request a *Caudill/Flack* instruction to constitute ineffective assistance—a conclusion the majority now completely upends in an "eeri[ly] similar[]" case. Regardless, the *Flack II* Court ultimately denied habeas relief for lack of prejudice because the accomplice's guilty plea was only mentioned twice and the State "did not emphasize" the plea. 239 W. Va. at 580, 803 S.E.2d at 550. The Court noted that the State asked only once about the guilty plea when addressing why the accomplice was wearing an orange jumpsuit and then mentioned it again once briefly in closing in stating that the accomplice "'accepted his responsibility[.]'" *Id.* [10]

In contrast, the accomplices' admissions and guilty pleas in the instant case were the near *exclusive* focus of petitioner's defense; the State likewise drew repeated attention to the pleas, attempting to "make hay" out of them by arguing these admissions

_____

[10] Because neither petitioner nor the State addresses this case in their briefs, neither addressed whether the State emphasized the guilty pleas of the accomplices in this case. The State cites *Flack II* for an isolated quote in the "proffering perjured testimony" portion of its brief. Nonetheless, the absolute necessity of the *Caudill/Flack* instruction is obvious from even a cursory review of the trial transcript as compared to limited role the guilty pleas played in *Flack II*.

made the accomplices *more* credible, not less. The guilty pleas of the accomplices were heavily discussed on direct and cross-examination of both accomplices by petitioner's counsel. And with good reason: petitioner's counsel's defense strategy was clearly to discredit the accomplices because they were effectively the prosecution's *only* evidence against petitioner. Consequently, rather than the instruction undermining counsel's trial strategy (as the majority suggests as a theoretical possibility), an instruction *from the court* that the guilty pleas could not be used to infer petitioner's guilt significantly augments counsel's strategy, which was to discredit the accomplices altogether as self-interested witnesses who offered testimony against petitioner in the hopes of a more lenient sentence.

Even absent trial counsel's focus on the accomplices' guilty pleas, the *State's* focus on the plea agreements alone demanded a cautionary instruction to ensure the jury did not infer petitioner's guilt from that of his alleged accomplices. From the very outset, the accomplices' guilty pleas were front and center in both the State and defense cases. In his opening, the prosecutor advised the jury:

> Let me tell you this: Kentrell Goodman has pled guilty to the crime of armed robbery. Pled guilty. He will testify today. Rashod Wicker has pled guilty to the crime of armed robbery. He will testify today. These men (indicating) are essentially charged with armed robbery. These are the three that the State seeks today to bring to justice.

As indicated above, the accomplices' plea agreements themselves were even introduced into evidence by the State and emphasized in its closing:

> Now, plea agreement . . . . *Here are the two plea agreements. You can take them back and you can read them*, and you can

19

criticize me if you want to. I made these decisions. I've got to make tough decisions. I made them. And I looked at Kentrell Goodman, nineteen. I looked at Rashod Wicker, eighteen or nineteen. And I said, 'Well, they implicated themselves in this crime. They're young. And in particularly in Rashod's case, he didn't go in the house.' And I thought that was worthy of the State's recommendation. I didn't buy their testimony. I thought that was just.

(emphasis added).

In addition to discussing the plea agreements themselves, the State made multiple additional references to the pleas, arguing that these two accomplice witnesses were *more* credible as a result of their plea/admissions, including the following statements:

> [I]f this was a case that was based solely on the testimony of Kentrell Goodman and Rashod Wicker, *who didn't implicate themselves in anything*, were just pointing their finger at everybody else, *I wouldn't have a very good case*, and I wouldn't present it to you.
>
> . . . .
>
> . . . [I]f I say "A crime occurred, and that person did it." That's pretty typical. And as a matter of fact, it happens a lot. I see it a lot. *It's very atypical when someone says, "A crime was committed; I did it, and these people did, too." That's very atypical . . . . But you should get some credit when you tell on yourself and you implicate other people* and what you tell the police is borne out by the physical evidence that we find. And you should also get some credit when the State is faced with a ton of circumstantial evidence that is highly coincidental, and you tie it together.

(emphasis added). Co-defendant Hill's attorney also highlighted the accomplices' guilty pleas in his closing:

20

> [L]et's also talk about the motivation that [Goodman and Wicker] had to appear here in court and testify. *These guys are looking at life in prison. In addition to that, there's two other charges they can be punished for.*
>
> . . . .
>
> Let's look at the motivation that both Mr. Wicker and Kentrell Goodman have. *Three of four felonies, gone. Robbery. They get a recommendation from the State to go to the Anthony Center, the Center for Youthful Offenders. They might be there for a year and a half or so. If they successfully complete the program, they get probation. They haven't been sentenced yet. Sentencing still hangs over their heads.*

(emphasis added). Clearly, the plea agreements and admissions of the accomplices in petitioner's trial predominated all parties' cases. This case was not one in which "a limiting instruction might only draw attention to an otherwise innocuous mention" and thereby undermine defense strategy. *Flack II*, 239 W. Va. at 579, 803 S.E.2d at 549. Instead, this case clearly falls into the category of cases acknowledged by *Flack II* where the accomplices' guilty plea evidence predominates the trial and "is of the character that it might be misconstrued by the jury" and therefore warrants a cautionary instruction. *Id.*[11]

---

[11] The circuit court dispensed with this issue on different grounds, noting that 1) two "veteran" trial attorneys representing co-defendants likewise did not request the instruction; and 2) petitioner's trial counsel's statement that it would benefit his client not to "overwhelm[]" the jury with instructions. First, the unexplained failure of the other co-defendants' counsel to not request an instruction is not tantamount to "strategy." Neither of the co-defendants' counsel testified at the habeas hearing below and trial counsel did not testify that these specific instructions were so much as discussed among his co-defense counsel. With respect to "overwhelming" the jury with instructions, this statement was made in reference to not repeating the core set of instructions three times for each defendant—*not* in declining mandatory, cautionary instructions which go to the State's primary evidence against petitioner.

More importantly, however, for purposes of the *Caudill/Flack* instruction, the State *directly* urged the jury to do precisely what *Caudill/Flack* forbids: to use the accomplices' guilt as a surrogate for petitioner's guilt. In closing, the prosecutor stated:

> *If you decide, "Well, I think these three should get the same treatment that Kentrell and Goodman"—"Kentrell Goodman and Rashod Wicker got," well, then, fine. Just convict them of armed robbery if you think that's fair.* But consider the differences in how they approached the case. And that's the basis for my decision. They had no obligation to testify, but they did.

(emphasis added). He further stated:

> *I lumped them all together, all of them*: Andrew Gunn; Rashod Wicker; Kentrell Goodman, Kevin Goodman, Jr.; Radee Hill; and Antwyn Gibbs. I lumped them all together because they deserve each other. *They deserve being lumped together* because none of them is doing right, none of them had any respect for this woman.

(emphasis added). The State clearly utilized the accomplices' guilty plea as a device to invite the jury to infer the guilt of petitioner. Where the State implores the jury to afford "similar treatment" to a defendant and "lump them all together," it expressly leverages the accomplices' guilty pleas as a tool to permit the jury to reach the same conclusion about petitioner. Without an instruction from the Court cautioning that it may not do so, the jury was left with the unmitigated entreaty of the State to afford petitioner the same fate as the admitted accomplices.

Before leaving this issue, I believe it necessary to address the circuit court's reasoning as to why the absence of a *Caudill/Flack* instruction did not warrant habeas

22

relief. Ironically—and in precise contradiction to the analysis in *Flack II*—the circuit court found no prejudice *because* the accomplices' pleas were the "center point" and "heart" of petitioner's defense theory. However, as the *Luck* case explains and *Flack II* demonstrates, it is precisely because the accomplices' pleas were the focal point of the case that these instructions—particularly the *Caudill/Flack* instruction—were so critical. The circuit court further found that it was "highly unlikely" there was jury "confusion" about whether the accomplices' pleas could be taken as proof of petitioner's guilt, noting various other instructions given which cautioned the jury to not to consider the evidence or guilt of *the defendants* collectively and arguments of counsel. Obviously, the collective guilt of the jointly tried codefendants presents an entirely separate issue from the inference of guilt from the accomplices' guilty pleas.

Moreover, this argument has been soundly rejected by the United States Supreme Court. The Supreme Court has observed that "arguments of counsel generally carry less weight with a jury than . . . instructions from the court" because they are "usually billed in advance to the jury as matters of argument, not evidence . . . and are likely viewed as the statements of advocates[.]" *Boyde v. California*, 494 U.S. 370, 384 (1990). In contrast, jury instructions "we have often recognized, are viewed as definitive and binding statements of the law[.]" *Id*. More specifically, "[a] court issued jury instruction carries the command and force of law in a way that a statement by counsel cannot, and thus prejudice that arises from a flawed or omitted jury instruction is not cured by mere

23

argument." *Lee v. Clarke*, 781 F.3d 114, 125-26 (4th Cir. 2015), *as amended* (Apr. 15, 2015).

The critical oversight of trial counsel failing to request the *Caudill/Flack* instruction alone warrants habeas relief. Coupled with the unexplained failure to request the *Humphreys/Bolling* instruction as well, petitioner was denied any semblance of effective assistance of counsel. Both instructions demonstrably enhance petitioner's defense by way of direct instruction from the Court to the jury regarding the State's primary evidence against him.

3.    COUNSEL'S FAILURE TO INTRODUCE THE TOLLBOOTH VIDEO OR PHOTOGRAPH

While I believe the foregoing instructional omissions by trial counsel are more than adequate to justify habeas relief, petitioner also presents potentially exculpatory evidence which was in his counsel's possession, but not introduced into evidence. During discovery in the criminal trial the State produced 4 CDs containing footage from tollbooths on the West Virginia Turnpike, which purportedly showed Ms. Hess' Acura traveling north through the tollbooths and then south through the tollbooths a few hours later. These CDs were not introduced into evidence at trial. During trial, the accomplices were questioned extensively about where each member of the five-person party was seated on the trip to and from West Virginia; the consensus appeared to be that petitioner—who is 6'4" tall— was sitting behind the driver at some point.

During the omnibus hearing below, petitioner's trial counsel was presented with a still photo apparently provided as part of video evidence from the tollbooths; petitioner's position is that the photo shows only one passenger in the rear of the vehicle on the passenger side. Upon being presented with the photo, trial counsel's immediate reaction was "I do not believe it's come from the videos that I've got." He explained further that "in the video I have the vehicle is towards the right of the shot and here the vehicle is towards the left. *So I do not believe I have seen this photo.*" (emphasis added).

However, after the omnibus hearing was concluded, trial counsel apparently retrieved his videos from his office, watched them with the parties' attorneys, and all confirmed that the still image was contained on the CDs.[12] Further, the State does not challenge that trial counsel was in actual possession of the photo. Therefore, the inescapable conclusion is that trial counsel either did not review the entirety of the videos

---

[12] Petitioner's brief explains:

> [A]fter Mr. Steele completed his testimony, he went to his office and returned with the CD's he had been provided by the State. These CD's were viewed by counsel for Petitioner and Respondent. *Three of the CD's were operational, including the video showing no person was seated behind Mr. Wicker.* Counsel stipulated that the one CD that did not work did not contain any significant video information.

(emphasis added).

25

or did not review them carefully; otherwise, the photo would not have admittedly "caught [him] by surprise" at the habeas hearing.

Regardless of why trial counsel had not previously seen the photo which was admittedly in his possession, he readily and unequivocally conceded: "It's very clear that nobody is sitting behind the driver seat in this photo." He elaborated that, "this is extremely valuable. . . . And had I had this shot I would've introduced it. Yes." In its answer to the habeas petition regarding the photo, the State similarly admitted, "it could fairly be argued that there is probably only one person in the back seat of the vehicle in question."

Again, the majority finds no ineffective assistance for failing to introduce the video, stating that "trial counsel reviewed [the tollbooth videos], reasonably found they contained little exculpatory value, . . . and strategically decided not to admit them." Obviously, the majority's analysis rests upon an entirely fictitious premise: that trial counsel made a reasoned, tactical decision not to introduce a photo that, despite being in his possession, *he had admittedly never seen*. Contrary to the majority's contention, by his own admission counsel did *not* "review" the potentially exculpatory photo or video, much less disregard it for tactical reasons. *Cf. Griffin*, 970 F.2d at 1358 (4th Cir. 1992) ("[T]he attorney's incompetent performance deprived him of the opportunity to even make a tactical decision about putting Staples on the stand.").

26

Finally, the majority alternatively suggests that the failure to introduce the photo was not ineffective because it "offer[s] little exculpatory value[.]"  With all due respect to the majority's presumed scrutiny of the video, the two individuals with the least to gain in admitting the photo may be exculpatory—petitioner's trial counsel who did not introduce the photo into evidence, and the State's prosecutor below seeking to defend the conviction—*both* admitted that the video showed only one person in the back seat.  That there is disagreement on this point merely demonstrates its value to petitioner's defense.  It is not the role of the Court in considering habeas relief to substitute itself as the jury and make factual determinations about what a jury would or would not have believed.  It is the Court's role to determine whether the absence of this evidence sufficiently prejudiced petitioner's ability to defend himself; the majority fails to even entertain this analysis, which readily demonstrates the necessity of habeas relief.

4.      THE "PREJUDICE" PRONG OF *MILLER/STRICKLAND*

Undoubtedly, the second prong of *Miller/Strickland* sets an extremely high bar, requiring a petitioner to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  Syl. Pt. 5, in part, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).  This Court has historically construed that requirement to be commensurate with simple prejudice, i.e. whether petitioner's defense was prejudiced by the ineffective assistance.  *See Ballard v. Ferguson*, 232 W. Va. 196, 206, 751 S.E.2d 716, 726 (2013) ("Mr. Ferguson is not entitled to relief

27

unless we also conclude that he was prejudiced by the deficient performance."); *accord Strickland*, 466 U.S. at 687 ("[T]he defendant must show that the deficient performance prejudiced the defense.").

Contrary to the circuit court's apparent belief, this standard does not require *exonerating* proof, nor does it require proof sufficient for an acquittal. As the Supreme Court explained, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. at 693. Instead, the prejudice prong is met where petitioner demonstrates the omitted evidence may have created reasonable doubt as to his guilt. *See id*. at 695 ("[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."). *Cf. Ballard*, 232 W. Va. at 207, 751 S.E.2d at 727 ("[W]e believe a jury could have reasonable doubts about the guilt of Mr. Ferguson."). Further, this Court has more easily found prejudice where there were cumulative errors.[13]

---

[13] *See State ex rel. Myers v. Painter*, 213 W. Va. 32, 38, 576 S.E.2d 277, 283 (2002) ("Taken cumulatively . . . [t]he actions and omissions of the appellant's trial counsel were outside the range of reasonable professional judgment, and taken together prejudiced the appellant's ability to obtain a fair trial."); *State ex rel. Humphries v. McBride*, 220 W. Va. 362, 372, 647 S.E.2d 798, 808 (2007) (finding "cumulative effect" of errors created "a reasonable probability that, but for [counsel's] errors, the result of Humphries' criminal trial would have been different."); *State ex rel. Bess v. Legursky*, 195 W. Va. 435, 444 n.10, 465 S.E.2d 892, 901 n.10 (1995) ("Appellant has proven prejudice as a result of the cumulative impact of multiple deficiencies in defense counsel's performance.")

Thus, the impact of the errors must be evaluated in light of the entire case presented by the prosecution. The loss of the opportunity to argue the content of the potentially exculpatory tollbooth photo, along with instructions from the court to be wary of the accomplices' testimony and guilty pleas—where they were effectively the only evidence against petitioner—could certainly reasonably be said to have prejudiced petitioner's defense. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). Particularly germane to the skeletal case against petitioner in this case, the *Strickland* Court further explained: "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695-96.

Further, a court may not scrape together crumbs of evidence to support a verdict in order to minimize the prejudicial effect of ineffective assistance; the overall fairness of the trial must be examined. The Fourth Circuit has characterized a court's prejudice determination as "fatally unreasonable" where it "neither acknowledge[s] nor obey[s] the *Strickland* requirement to 'consider the totality of the evidence before the . . . jury'":

> In the context of assessing the prejudicial effect of a failure to investigate mitigation evidence for sentencing, a court acts unreasonably if it does not "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at

29

397–98, 120 S.Ct. 1495; *see also Porter v. McCollum*, 558 U.S. 30, 130 S.Ct. 447, 454, 175 L.Ed.2d 398 (2009) (per curiam) ("The [state habeas court's] decision that Porter was not prejudiced by his counsel's failure to conduct a thorough—or even cursory—investigation is unreasonable [under *Strickland*]. The [court] either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing."); *Rompilla*, 545 U.S. at 390-93, 125 S.Ct. 2456 (finding prejudice under same totality-of-evidence standard on de novo review); *Wiggins*, 539 U.S. at 534-38, 123 S.Ct. 2527 (same).

*Elmore v. Ozmint*, 661 F.3d 783, 867-68 (4th Cir. 2011), *as amended* (Dec. 12, 2012).

Like the majority's discussion of the evidence herein, the *Elmore* court found that the state court "unreasonably discounted evidence favorable to Elmore by unduly minimizing its import and evaluating it piecemeal." *Id*. at 868. In its discussion, the majority seizes upon singular points on cross-examination, an inconclusive "tip" by petitioner's mother, and petitioner's mere proximity to admitted participants in the crime to bolster the evidentiary picture. However, there is little doubt that had the two accomplice instructions been given, along with introduction of the hotly contested tollbooth photo, "the jury undeniably would have seen a drastically different—and significantly weaker— prosecution case." *Id*. at 870.

By no means, however, do I suggest that but for trial counsel's omissions, petitioner would have been acquitted; that is not the standard. However, like *Elmore*, the State's "evidence of guilt, flimsy of its own right, is diminished further" if counsel had requested the instructions and introduced the photo. *Id*. at 871. *See also Grueninger v.*

*Dir., Va. Dep't of Corr.*, 813 F.3d 517, 532 (4th Cir. 2016) ("We do not mean to suggest that the Commonwealth's independent evidence was insubstantial, or that it could not have supported a guilty verdict in the absence of Grueninger's confession. But that is not the standard we are to apply. Instead, the question is whether there is a 'reasonable probability' of a different outcome at trial had Grueninger's confession been excluded." (citations omitted)).

The extraordinary remedy of habeas corpus must be judiciously guarded. However, it is equally imperative that such relief be granted, and a new trial afforded, where a defendant's defense was so imperiled by attorney error that the trial was rendered fundamentally unfair. Therefore, for the foregoing reasons, I respectfully dissent from the majority's refusal to grant the instant petition for writ of habeas corpus.